**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **KENNEDY F. JONES, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )  **Case No. 4:24-cv-00649-RK** |
| | ) |
| **CITY OF KANSAS CITY, MISSOURI,** | ) |
| | ) |
| **Defendant.** | ) |

**DEFENDANT CITY OF KANSAS CITY, MISSOURI'S SUGGESTIONS IN
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Tara M. Kelly, #64624
 Senior Associate City Attorney
Jason C. Conkright, #58295
 Assistant City Attorney
2300 City Hall, 414 E. 12th Street
Kansas City, Missouri 64104
Telephone: (816) 513-3117/3127
Facsimile: (816) 513-3133/2716
Email: tara.kelly@kcmo.org
 jason.conkright@kcmo.org
**ATTORNEYS FOR DEFENDANT
CITY OF KANSAS CITY, MISSOURI**

# TABLE OF CONTENTS

Table of Authorities……………………………………………….......................... iii

Introduction…………………………………………………………………........... 1

Standard of Review………………………………………………….............…. 2

Argument……………………………………………………………….........……... 3

   A.  Plaintiffs' Motion fails to demonstrate a likelihood of success on the merits……...…… 3

      1.  Plaintiffs have not demonstrated the Ordinance is unconstitutional on its face... 3

      2.  The Ordinance is not unconstitutional as applied to the Plaintiffs' circumstances…………………………………………………………… 4

      3.  The Ordinance does not violate the Plaintiffs' Fourth Amendment Rights……… 6

         a.  Plaintiffs have no reasonable expectation of privacy in their residential rental property……………………………………………………… 8

         b.  Plaintiffs already voluntarily consent to warrantless inspection of their rental properties………………………………………….……… 9

      4.  Even if the Ordinance does implicate Plaintiffs' Fourth Amendment rights by compelling warrantless inspection, the residential rental industry is a closely regulated industry in which warrantless inspections are permissible…...……… 10

         a.  The business of rental properties is closely regulated……………………… 11

         b.  The warrantless inspection required by Section 8 meets the *Burger* test for closely regulated industry warrantless inspections………………………... 18

      5.  The City is not preempted by federal law in requiring landlords to not discriminate against those with Section 8 vouchers…………………………... 21

   B.  Public interest, irreparable harm, and balance of the equities all require denial of a preliminary injunction …………………………….....................………………………… 30

Conclusion.............................………………...............………………………………... 34

Certificate of Service……………………………….........………………………….. 34

ii

# TABLE OF AUTHORITIES

## Cases

*Attorney General v. Brown*, 511 N.E.2d 1103 (1987) ............................................................ 25, 26

*Austin Apartment Ass'n v. City of Austin*, 89 F.Supp.3d 886 (W.D. Tex. 2015) ................... 26, 27

*Azam v. City of Columbia Heights*, 865 F.3d 980 (8th Cir. 2017) ............................................. 7, 8

*Barrett v. Claycomb*, 705 F.3d 315 (8th Cir. 2013) ................................................................... 2

*Beber v. NavSav Holdings, LLC*, __ F.4th __, 2024 WL 4353525 (8th Cir. Oct. 1, 2024) ......... 33

*Bond v. U.S.*, 529 U.S. 334 (2000) ............................................................................................ 7

*Bourbeau v. Jonathan Woodner Co.*, 549 F.Supp.2d 78 (D.D.C. 2008) ........................ 26, 27, 28

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ................................................................................ 3

*Camara v. Mun. Court of City and Cnty. of San Francisco*, 387 U.S. 523 (1967) ...................... 9

*Chateau Foghorn LP v. Hosford*, 168 A.3d 824 (Md. 2017) .................................................... 11

*Cigna Corp. v. Bricker*, 103 F.4th 1336 (8th Cir. 2024) .......................................................... 2

*Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10 (1993) ................................................................ 23

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ............................................................ 11, 20

*Comm'n on Human Rights and Opportunities v. Sullivan Assocs.*, 739 A.2d 238
(Conn. 1999) ................................................................................................................... 22, 26

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) .................................................. 22

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) ........................................ 2

*Detling v. Edelbrock*, 671 S.W.2d 265 (Mo. banc 1984) ............................................... 15, 16, 18

*Donovan v. Lone Steer, Inc.*, 464 U.S. 408 (1984) .................................................................. 20

*Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003) ......................................................... 29

*Franklin Tower One v. N.M.*, 725 A.2d 1104 (N.J. 1999) .................................................. 25, 26

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ................................................................................ 22

*Hous. & Redevelopment Auth. of Duluth v. Lee*, 832 N.W.2d 868 (Minn. Ct. App. 2013) ......... 12

*Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016) ...................................................... 22

*Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071 (D.C. Cir. 1970) ......................................... 15

*Johnson v. Smith*, 104 F.4th 153 (10th Cir. 2024) ........................................................ 10, 11, 14

*Kadera v. Superior Court In & For Cnty. of Maricopa*, 931 P.2d 1067 (Ariz. App. 1996) ......... 12

*King v. Moorehead*, 495 S.W.2d 65 (Mo. App. K.C. 1973) ............................................... 14, 15

*Knapp v. Eagle Prop. Mgmt.*, 54 F.3d 1272 (7th Cir. 1995) .................................................... 26

iii

*Lindsey v. Normet*, 405 U.S. 56 (1972) ............................................................... 11

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ................... 11

*Marcavage v. Borough of Landsdowne, Pa.*, 826 F.Supp.2d 732 (E.D. Pa. 2011) ...... 8

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ....................................................... 22

*Minton v. Hardinger*, 438 S.W.2d 3 (Mo. 1968) ................................................. 16

*Montgomery Cnty. v. Glenmont Hills Assocs.*, 936 A.2d 325 (Md. 2007) ............... 23, 26, 28, 29

*New York v. Burger*, 482 U.S. 691 (1987) .............................................. 8, 10, 11, 14

*N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405 (1973) ............................ 24

*Novus Franchising, Inc. v. Dawson*, 725 F.3d 885 (8th Cir. 2013) ........................... 33

*Pharm. Research and Mfrs. of Am. v. McClain*, 95 F.4th 1136 (8th Cir. 2024) ......... 22

*Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008) ........................................ 30, 31

*Powers v. U.S. Postal Serv.*, 671 F.2d 1041 (7th Cir. 1982) ................................... 12

*Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701 (8th Cir. 2011) ................... 33

*Rowe v. Pierce*, 622 F.Supp. 1030 (D.D.C. 1985) ............................................... 12

*Rozman v. City of Columbia Heights*, 268 F.3d 588 (8th Cir.) ................................. 8

*Tarantino v. City of Hornell*, 615 F.Supp.2d 102 (W.D.N.Y 2009) ........................... 8

*Troupe v. Fairview Apartments*, 464 F.Supp. 234 (E.D. Tenn. 1979) ........................ 12

*U.S. v. Campbell*, 309 F.Supp.3d 738 (D.S.D. 2018) ............................................ 5

*U.S. v. Veasley*, 98 F.4th 906 (8th Cir. 2024) ..................................................... 3

*Va. Uranium, Inc. v. Warren*, 587 U.S. __ (2019) ............................................... 23

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524 (5th Cir. 2013) ....... 11

**Statutes**

12 U.S.C. § 4122 .............................................................................................. 29

42 U.S.C. § 1427f ....................................................................................... 19, 22, 23

42 U.S.C. § 1437 ....................................................................................... 19, 23, 27

RSMo. § 213.040 ............................................................................................ 16

**Regulations**

24 C.F.R. § 982.1 ......................................................................................... 5, 6

24 C.F.R § 982.306 .......................................................................................... 6

24 C.F.R. § 982.307 ....................................................................................... 28, 29

24 C.F.R. § 982.551 .......................................................................................... 8

24 CFR § 982.53 ............................................................................................... 24, 27

**Other Authorities**

58 FR 11292 (Feb. 24, 1993) .................................................................................. 23

60 FR 34660 (July 3, 1995) .................................................................................... 24

64 FR 56894 (Oct. 21, 1999) .................................................................................. 24

S. Rep. No. 105-21 ................................................................................................. 28

K.C. Code § 34-830 ............................................................................................. 9, 16

K.C. Code § 34-832 ............................................................................................. 9, 16

K.C. Code § 34-835 ............................................................................................. 9, 16

K.C. Code § 34-846 ............................................................................................. 9, 17

K.C. Code § 34-848.1 ............................................................................................. 17

K.C. Code § 38-23 ................................................................................................... 21

K.C. Code § 38-105 ............................................................................................. 4, 17

# I. INTRODUCTION

In their Motion, Plaintiffs request the Court to enjoin the City from enforcing its laws prohibiting housing discrimination on the basis of lawful sources of income as provided by Ordinance No. 231019 ("Ordinance"). As discussed in more detail below, Plaintiffs have not demonstrated they have a likelihood of success on the merits, or a threat of irreparable harm if this Court does not grant them relief.

Plaintiffs' assertion that the Ordinance is unconstitutional rests on the incorrect assumption that the Ordinance requires landlords to participate in Section 8. It does not. The Ordinance contains no language compelling landlords to participate in Section 8, nor does it compel landlords to consent to any warrantless inspections. Instead, the Ordinance simply and plainly prohibits landlords from engaging in a variety of discriminatory conduct on the basis of a renter's source of income. Plaintiffs have not demonstrated they have properties that would require Section 8 participation, and therefore cannot succeed on a facial or as-applied challenge to the Ordinance.

Moreover, because Plaintiffs have not demonstrated in their Motion that they have properties which would require Section 8 participation (and thus, according to their assertion, require consent to warrantless inspections) they cannot show that they are subject to such great and imminent harm that there is an immediate need for equitable relief.

Finally, Plaintiffs have not demonstrated in their Motion that the public interest is served by the issuance of a preliminary injunction. In fact, the opposite is true. Plaintiffs do not have the likelihood of success on either their Fourth Amendment or federal preemption arguments; granting a preliminary injunction would do nothing more than upend the system that both tenants and landlords currently rely. More importantly, enjoining the Ordinance would leave those tenants without protection against landlords seeking to discriminate against the marginalized in our

1

community. This Court's denial of Plaintiffs' Motion protects the public's interest in ensuring safe, affordable housing options in Kansas City. Accordingly, because Plaintiffs have failed to provide sufficient grounds to support their request for a preliminary injunction, this Court should deny their Motion.

## II.     STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right. Its primary function is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (cleaned up; internal citations and quotations omitted). The status quo result for this case is the continued enforcement of the Ordinance which currently protects thousands of renters from source of income discrimination and with which thousands of landlords are currently complying.

When determining whether to issue a preliminary injunction, the Court considers: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). Generally, no one of these factors is determinative. *Id.* at 113. However, "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (internal quotation omitted). Here, all four elements of the *Dataphase* test come down in favor of the City and continued enforcement of the Ordinance.

2

### III.    ARGUMENT

**A. Plaintiffs' Motion fails to demonstrate a likelihood of success on the merits.**

Plaintiffs' Motion should be denied due to their failure to clearly demonstrate a likelihood of success on the merits. Both of Plaintiffs' arguments – that there is a violation of the Fourth Amendment and federal law preempts the City's Ordinance – assume the Ordinance requires landlords to participate in Section 8. *See* Doc. 3 p.1 ("The Ordinance makes landlord participation in the federal housing choice voucher program authorized by Section 8 of the Housing Act of 1937 . . . mandatory . . . ."). Because the Ordinance does <u>not</u> require Section 8 participation and because Plaintiffs have not shown that they have properties that would require Section 8 participation, they can succeed on neither a facial nor as applied challenge to the Ordinance.

**1. Plaintiffs have not demonstrated the Ordinance is unconstitutional on its face.**

Although Plaintiffs have generally claimed as much in their Complaint, they have failed to demonstrate in their Motion that the Ordinance is unconstitutional on its face and cannot demonstrate a likelihood of success on the merits.

A "facial challenge is really just a claim that the law or policy at issue is unconstitutional in *all* its applications, regardless of the individual circumstances." *U.S. v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024) (citing and quoting *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019)). (emphasis in original). In other words, to demonstrate that the Ordinance violates the Fourth Amendment on its face, the Plaintiffs must demonstrate that there are "no set of circumstances under which [it] would be valid." *Id.* (cleaned up). If there are some applications in which the Ordinance is constitutional, "then facially speaking" it is constitutional. *Id.*

Here, Plaintiffs have not demonstrated that, on its face, the Ordinance violates the Fourth Amendment or federal preemption. This is because they cannot. Nothing in the Ordinance requires

or compels landlords to participate in Section 8 or to consent to any warrantless inspections. Instead, the plain language of the Ordinance simply prohibits landlords from engaging in a variety of discriminatory conduct on the basis of a renter's source of income. It prohibits refusing to rent to a tenant. K.C. Code § 38-105(d)(1). It prohibits misrepresenting availability to a tenant. K.C. Code § 38-105(d)(4). It prohibits discriminating against a person with respect to the terms, conditions, or privileges of renting a dwelling, or in the provision of services or facilities with respect to renting a dwelling. K.C. Code § 38-105(d)(2). It prohibits publishing or advertising preferences or limitations on renting a dwelling. KC Code § 38-105(d)(3). And it prohibits the refusal to rent to a tenant on the basis of a rent-to-income ratio that does not take into account lawful sources of income, such as vouchers, maintenance, disability payments, pensions, or other income support. KC Code § 38-105(d)(10).

Certainly, a landlord's Fourth Amendment rights or the right to voluntarily participate in Section 8 are not implicated by prohibiting them from refusing to rent a dwelling to a person solely because that person's income is in the form of maintenance or spousal support payments, or disability payments, or pension payments. And requiring landlords to take into account other forms of income in determining a renter's rent-to-income ratio does not either. Because those applications of the Ordinance do not violate the Fourth Amendment and are constitutional, on its face then, the Ordinance *must* be deemed constitutional. Plaintiffs' claims must fail and the Court should deny Plaintiffs' Motion.

## 2. The Ordinance is not unconstitutional as applied to the Plaintiffs' circumstances.

Similar to their facial challenge discussed above, Plaintiffs fail to demonstrate that under their specific circumstances, the Ordinance violates their Fourth Amendment rights or implicates federal preemption, and thus fail to show success for an as-applied challenge. "In an as-applied

4

challenge, the challenger must show that the statute is unconstitutional because of the way it was applied to the particular facts of *their* case." *U.S. v. Campbell*, 309 F.Supp.3d 738, 745 (D.S.D. 2018) (citations and internal quotations omitted). Therefore, to succeed on their claims, Plaintiffs must demonstrate that the Ordinance, *as applied to them*, unreasonably infringes upon their legitimate privacy interest or is preempted by federal law. This, Plaintiffs have not and cannot do.

First, as discussed *infra*, Plaintiffs do not have a reasonable expectation of privacy that is being violated with the Ordinance. And Plaintiffs identify no such privacy interest in their Motion. Even if one were to assume the Ordinance did what Plaintiffs claim – compel participation in Section 8 and compel warrantless inspections – Plaintiffs suffer no infringement upon a legitimate privacy interest. As additionally discussed *infra*, even if the Ordinance did compel warrantless searches – which it does not – those warrantless searches would be permissible as the residential rental business is a closely regulated industry.

Second, assuming Plaintiffs do have a privacy interest and the residential rental industry is not a closely regulated industry, Plaintiffs have not shown that they or their properties qualify under Section 8. Without such a showing, Plaintiffs cannot demonstrate that the Ordinance compels them to participate in Section 8, thereby implicating their Fourth Amendment rights or federal preemption.

Under the Section 8 voucher program, HUD pays rental subsidies "so eligible families can afford decent, safe, and sanitary housing." 24 C.F.R. § 982.1(a)(1). The program is administered by local government entities, or public housing agencies ("PHA"). *Id.* Under the program, families must choose and rent units that meet housing quality standards, and voucher payment standards. *See* 24 C.F.R. § 982.1(a)(2). The unit must meet an acceptable level of health and safety and rent

requested by the landlord must be reasonable. HAKC, HAV (Section 8) Program, *available at* https://www.hakc.org/hcv-section8-program (last visited 10/22/24).

Once a family chooses a unit, the PHA must approve the family's choice, and if they do, will contract with the landlord. *Id.* However, the PHA will not approve the selection of a unit unless it meets the housing quality standards, and the rent is reasonable. *See* 24 C.F.R. § 982.1(a)(2). In other words, for a landlord to participate in the Section 8 voucher program, they must rent units that qualify with respect to housing quality standards, and the voucher payment standards. For example, if the rent a landlord charges is too high, or unreasonable, the PHA will reject the family's choice of that unit, resulting in the landlord being unable to participate in the Section 8 voucher program.

Here, Plaintiffs have not demonstrated they qualify to rent their units under Section 8. They give no details regarding the units they rent, the amount of rent they charge, the housing quality standard their units meet, or if they themselves would otherwise qualify under the restrictions listed in 24 C.F.R § 982.306. Without demonstrating that their rental property is capable of being rented under the Section 8 voucher program, Plaintiffs cannot demonstrate that they are compelled to participate in that program and accept Section 8 voucher and submit to Section 8 inspection. Accordingly, Plaintiffs have failed to demonstrate that the Ordinance, as applied to their specific circumstances, implicates a legitimate privacy interest or federal preemption, and therefore have failed to demonstrate they have a likelihood of success on the merits of their claims.

### 3. The Ordinance does not violate the Plaintiffs' Fourth Amendment rights.

Even assuming that the Ordinance required participation in Section 8 – which it does not – and that the Plaintiffs' properties qualify for Section 8 participation – which they have not shown – Plaintiffs cannot show a likelihood of success on the merits because a Section 8 inspection does

6

not implicate their reasonable expectation of privacy and Plaintiffs already voluntarily consent to Healthy Homes Rental Inspection Program ("Healthy Homes") inspections pursuant to their agreement to do business in the City.

The Fourth Amendment prohibits unreasonable searches and seizures by the government, and this protection extends to a person's home, as well as place of business. *Azam v. City of Columbia Heights*, 865 F.3d 980, 988-89 (8th Cir. 2017). "The Supreme Court has interpreted the Fourth Amendment as proscribing unreasonable searches that intrude upon a person's reasonable expectation of privacy." *Id.* (citing *Bond v. U.S.*, 529 U.S. 334, 338-39 (2000)). To demonstrate a violation of a reasonable expectation of privacy, a party must show that (1) they have "an actual (subjective) expectation of privacy," and (2) "the expectation is one that society is prepared to recognize as reasonable." *Id.* (cleaned up).

Plaintiffs, as landlords, have not and cannot demonstrate they have a reasonable expectation of privacy in their residential rental property. This is because, as landlords, they have no reasonable expectation of privacy in their rental property, because they open that property up to third parties as a necessary part of their rental business. Thus, any inspections of Plaintiffs' rental property do not infringe upon any legitimate privacy interest.

In addition, as landlords renting residential property in the City of Kansas City, Missouri, Plaintiffs are already subjected to warrantless inspections of their rental property under Healthy Homes. They have no reasonable expectation of privacy from inspections of their rental property under Section 8, as they are already subject to the very same warrantless inspections under the City's regulatory scheme. Therefore, because Plaintiffs do not, and cannot demonstrate they have a reasonable expectation of privacy, Plaintiffs are unable to meet their burden of showing they have a likelihood of success on the merits of their claims.

7

### a. Plaintiffs have no reasonable expectation of privacy in their residential rental property.

Plaintiffs generally claim the Ordinance is unconstitutional because it compels landlords to consent to warrantless inspections by compelling them to participate in Section 8. As mentioned above, to demonstrate a violation of the Fourth Amendment requires a party to show that (1) they have "an actual (subjective) expectation of privacy," and (2) "the expectation is one that society is prepared to recognize as reasonable." *Azam*, 865 F.3d at 988-89. But Plaintiffs have not offered discussion or support for what legitimate privacy interest is infringed upon.

The Fourth Amendment protects a person's privacy in their home, as well as their place of business or commercial property. *New York v. Burger*, 482 U.S.691, 699-700 (1987). However, by leasing rental property, a landlord abandons any reasonable expectation of privacy in the leased spaces and the common areas of their rental property[1], as the landlord gives access to those areas to tenants and invitees of the tenants. *See Marcavage v. Borough of Landsdowne, Pa.*, 826 F.Supp.2d 732 (E.D. Pa. 2011) (citing *Rozman v. City of Columbia Heights*, 268 F.3d 588 (8th Cir.)) (holding that a landlord does not have a reasonable expectation of privacy in individual residential rental units leased to third parties.); *Tarantino v. City of Hornell*, 615 F.Supp.2d 102, 109 (W.D.N.Y 2009) ("It is well established that a landlord does not have a reasonable expectation of privacy with respect to property that he has rented to a tenant."); *Azam*, 865 F.3d. at 989-90 (holding that a landlord does not have a reasonable expectation of privacy in the common areas or hallways of the residential rental property). Any other area of the rental property which would not be accessible by tenants or the public would necessarily be subject to a legitimate government

---

[1]      This analysis applies only to the expectation of privacy of the *landlord* and not the tenant, as the leased space is the tenant's home. As voluntary participants in Section 8, the tenant, however, has also consented to habitability inspections of the space they rent. *See* 24 C.F.R. § 982.551(d).

interest in ensuring the establishment of health and safety standards in residential rental property. *See Camara v. Mun. Court of City and Cnty. of San Francisco*, 387 U.S. 523, 537 (1967) (finding area code-enforcement inspections reasonable, because "the public interest demands that all dangerous conditions be prevented and abated"). As such, any inspections to which Plaintiffs claim they are compelled to consent would not infringe upon any *legitimate* privacy interest.

> **b. Plaintiffs already voluntarily consent to warrantless inspection of their rental properties.**

Even if the Ordinance does compel Plaintiffs to consent to inspections under Section 8, as landlords renting residential property in Kansas City, Plaintiffs would not be subjected to any inspections to which they are not already subject. The City enacted ordinances generally referred to as Healthy Homes, the purpose of which "is to protect the public health, safety and welfare in residential rental property units through establishment of minimum health and safety standards." K.C. Code § 34-830(a). Under the Health Homes, landlords must obtain a permit to offer for rent any residential rental unit. K.C. Code § 34-832. To obtain a permit, a landlord must submit a health and safety inspection report to the City, as well as agree to allow inspections of the rental property. K.C. Code § 34-835. Inspections under Healthy Homes are allowed based on complaints and according to a randomized percentage of total rental properties. K.C. Code § 34-846.

As landlords renting residential property in the City, therefore, Plaintiffs already provide to the City health and safety inspection reports regarding their rental property, and they already consent to having their rental property inspected to ensure health and safety standards are met. Any additional inspections imposed by the Ordinance's purported requirement that they participate in Section 8, would not infringe upon a legitimate privacy interest, as the inspections under Section 8 would be no different than those for which Plaintiffs have already given consent. Therefore, Plaintiffs cannot show any legitimate privacy interest that is implicated by the Ordinance, and as

9

a result, Plaintiffs cannot demonstrate a likelihood of success on the merits of their claims on Fourth Amendment grounds.

> **4. Even if the Ordinance does implicate Plaintiffs' Fourth Amendment rights by compelling warrantless inspection, the residential rental industry is a closely regulated industry in which warrantless inspections are permissible.**

It is axiomatic that landlords use rental properties for commercial means; it is, after all, how a landlord conducts business and makes money. "An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home. This expectation is particularly attenuated in commercial property employed in 'closely regulated' industries. The Court observed in *Marshall v. Barlow's, Inc.*: 'Certain industries have such a history of government oversight that no reasonable expectation of privacy, could exist for a proprietor over the stock of such an enterprise.'" *Burger*, 482 U.S. at 700 (internal citations omitted).

In "situations of 'special need,' where the privacy interests of the owner are weakened and the government interest in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." *Id.* at 702 (internal citation omitted). "Warrantless inspections of certain businesses or industries are constitutionally permissible when the regulatory regime authorizing the inspections passes a two-part test. First, the business or industry to be inspected must be 'closely regulated.'" *Johnson v. Smith*, 104 F.4th 153, 159 (10th Cir. 2024). Second, the regime must then pass the *Burger* criteria:

> First, there must be "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made. . . . Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." . . . Finally, . . . the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made

10

> pursuant to the law and has a properly defined scope, and it must
> limit the discretion of the inspecting officers.

*Burger*, 482 U.S. at 702-03. *See also City of Los Angeles v. Patel*, 576 U.S. 409, 426 (2015)

(reaffirming the validity of the *Burger* test).

### a. The business of rental properties is closely regulated.

In determining whether a business is closely regulated, the Supreme Court has

> looked to factors including the duration of the regulatory tradition;
> the comprehensiveness of the regulatory regime; and the imposition
> of similar regulations by other jurisdictions. These factors are not
> talismans, but shed light on the expectation of privacy the owner of
> a business may reasonably have, which in turn affects the
> reasonableness of a warrantless search.

*Patel*, 576 U.S. at 432 (Scalia, J., dissenting; internal citations omitted). *See also Johnson*, 104

F.4th at 169 ("considering the history of the inspection regime, the extent of regulations . . . ,

regulation by other jurisdictions, and the risk to public welfare" in the analysis of close regulation).

"Throughout the eighteenth and nineteenth centuries, landlord-tenant law was primarily a

creature of contract and the common law overseen by state or local courts. In more recent decades,

state legislatures have enacted statutes that have greatly expanded tenant rights and protections

while limiting the power of landlords." *Chateau Foghorn LP v. Hosford*, 168 A.3d 824, 840 (Md.

2017). The regulations are comprised of a patchwork of state, county, and local law, as landlord-

tenant law is an area traditionally regulated by state and local governments and not federalized.

*See Lindsey v. Normet*, 405 U.S. 56, 68 (1972) (holding that "[t]he Constitution has not federalized

the substantive law of landlord-tenant relations"); *Loretto v. Teleprompter Manhattan CATV

Corp.*, 458 U.S. 419, 440 (1982) (noting that "[t]his Court has consistently affirmed that States

have broad power to regulate housing conditions in general and the landlord-tenant relationship in

particular"); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 565–66

(5th Cir. 2013) (concluding that local housing regulation was within traditional police power of local jurisdictions); *Powers v. U.S. Postal Serv.*, 671 F.2d 1041, 1045 (7th Cir. 1982) (recognizing that "a federal common law of landlord and tenant does not exist"); *Hous. & Redevelopment Auth. of Duluth v. Lee*, 832 N.W.2d 868, 873 (Minn. Ct. App. 2013) (holding that "regulation of landlord-tenant relations is a traditional area of state concern"); *Kadera v. Superior Court In & For Cnty. of Maricopa*, 931 P.2d 1067, 1071 (Ariz. App. 1996) (holding similarly); *Rowe v. Pierce*, 622 F.Supp. 1030, 1033 (D.D.C. 1985) (holding similarly); *Troupe v. Fairview Apartments*, 464 F.Supp. 234, 235 (E.D. Tenn. 1979) (holding similarly).

Despite the lack of federalization of landlord tenant law, landlords must still comply with a host of federal regulations, including the Fair Housing Act which prohibits discrimination in the rental of housing based on race, color, national origin, religion, sex, familial status, or disability; the Americans with Disabilities Act, which requires landlords to make reasonable accommodations for tenants with disabilities, ensuring they have equal access to housing and related facilities; the Fair Credit Reporting Act, which regulates how landlords can obtain and use tenant credit and background reports during the application process; the Fair Debt Collection Practices Act, which sets guidelines for how debt collectors, including landlords, can collect debts from tenants; the Lead-Based Paint Disclosure Act, which requires landlords of residential properties built before 1978 to disclose the presence of lead-based paint and hazards to tenants and potential renters; and the Protecting Tenants at Foreclosure Act, which provides protections to tenants when the property they are renting is foreclosed upon.

But state and local law is where most of the regulation of the landlord-tenant relationship has occurred. Since the late 1960s, "we have experienced a revolution in residential landlord-tenant law. The residential tenant, long the stepchild of the law, has now become its ward and darling.

Tenants' rights have increased dramatically; landlords' rights have decreased dramatically."
Edward H. Rabin, *The Revolution in Residential Landlord-Tenant Law: Causes and Consequences*, 69 Cornell L. Rev. 517, 519 (1984). These regulations include protections of the tenant when living in substandard living conditions, *id.* at 521-27; rent control which, as of 2022, exists in over 200 state and local governments[2]; court rulings that have increased a landlord's tort liability, *Rabin*, *supra* at 529-30; limitations on a landlord's common law right to choose or reject new tenants due to antidiscrimination laws or void lease clauses that withhold the right to assign or sublet, *id.* at 531-33; limitations on a landlord's common law right to evict a tenant[3], *id.* at 533-37; limiting a landlord's common law remedies following a tenant's breach of the lease, *id.* at 537-39 (explicitly recognizing duty to mitigate damages and limiting self-help remedies to gain possession); and limiting security deposits. *Id.* at 539-40. This increase has continued in the decades since: "The past few years have seen a groundswell of attention to tenants' right issues across the United States, driven by the pressures of the country's ongoing affordable housing crisis and recently spurred to new heights by the COVID-19 pandemic, inflation, and a marked slowdown in housing construction during and after the Great Recession." Nathan Cummings, *Anticipating the Impact of the White' House's Blueprint for a Renter Bill of Rights*, 32 J. of

---

[2]     National Apartment Association, *Rent Control: Policy Issue*, *available at* https://www.naahq.org/rent-control-policy#:~:text=Currently%2C%2033%20states%20preempt%20local,rent%20control%20policy%20in%20place (last visited 10/22/24).

[3]     Further infringement on a landlord's right to evict a tenant was widespread during the COVID pandemic. The federal government implemented three eviction moratoria during the pandemic: the CARES Act and two iterations of the CDC's Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19. The Eviction Lab, *COVID-19 Housing Policy Scorecard*, *available at* https://evictionlab.org/covid-policy-scorecard/ (last updated 6/30/21; last visited 10/22/24). In addition to the federal government, forty-three states, the District of Columbia, five American territories, and numerous cities and counties all adopted eviction moratoria. Danya E. Keene, "*A Little Bit of a Security Blanket*": Renter Experiences with COVID-19-Era Eviction Moratoriums, 97 Soc. Serv. Rev. 423, 424 (2023).

13

Affordable Housing & Community Dev. L. 119, 120 (2023). Regulation of the landlord-tenant relationship is expansive and endemic.

Further, "[a]n industry is more likely to be considered closely regulated if the federal government or the great majority of states have adopted similar inspection regimes." *Johnson*, 104 F.4th at 171 (citing *Burger*, 482 U.S. at 705). As an initial matter, the federal government has, of course, adopted Section 8 inspections, as it is part of the federal regulatory regime. As for state and local governments, the City is far from unique: by 2020, seventeen states and over seventy localities had enacted housing laws that ban some form of source-of-income discrimination. Robert G. Schwemm, *Source-of-Income Discrimination and the Fair Housing Act*, 70 Case W. Res. L. Rev. 573, 591 (2020). By September 2024, those numbers had increased to twenty-three states and over 160 cities and counties enacted such legislation. Poverty & Race Research Action Council, *Appendix B: State, Local, and Federal Laws Barring Source-of-Income Discrimination*, *available at* www.prrac.org/pdf/AppendixB.pdf (Sept. 2024, last visited 10/22/24). Nor is the City even the only locality in *Missouri* to have enacted such regulations. Clayton, Columbia, Saint Louis, and Webster Groves have all enacted source of income discrimination laws.

And these state law tenant protections have reached Missouri's regulatory scheme. In 1939, Missouri enacted the Housing Authorities Law, "which authorized the improvement and construction of dwelling units to relieve the 'shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford.'" *King v. Moorehead*, 495 S.W.2d 65 (Mo. App. K.C. 1973) (citing RSMo. Chapter 39). This was followed in 1969 by passage of the Enforcement of Minimum Housing Code Standards Act, codified in RSMo. Chapter 441. "This statute has as its purpose the coercive repair . . . of conditions harmful to the life, health and safety of occupants of a dwelling unit resulting from violations of the housing code." *King*, 495 S.W.2d

14

at 73. This coercive repair had the effect of "extending the life of residential housing accommodations which otherwise would have lapsed into blight." *Id.* Importantly, the Enforcement of Minimum Code Standards statute recognized the importance of the "habitability of residential dwellings," coerces repairs to meet minimum standards for "life, health and safety," and modifies the contractual obligations between landlords and tenants. *Id.* at 73-74.

Concurrently, Missouri courts were recognizing the importance of the implied warrant of habitability within a lease. During agrarian times, it was "assumed that the land was the most important feature" of the lease and the land was conveyed "without reference to the condition of the buildings or structures on it." *Id.* at 69 (internal citation omitted). Whether the buildings were habitable or not, rent was still due. In the early 1900s, however, Missouri courts recognized the idea of constructive eviction which states that a "tenant is allowed to abandon the lease . . . because of the landlord's conduct . . . ." *Id.* at 70. This was the first recognition by courts "to insure habitability . . . ." *Id.*

With the change from agricultural to urban societies, the land itself became "of no value to an urban dweller." *Id.* Therefore, the urban tenant "seeks and expects 'a well known package of goods and service – a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation and proper maintenance.'" *Id.* (quoting *Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1074 (D.C. Cir. 1970). *See also Detling v. Edelbrock*, 671 S.W.2d 265, 269 (Mo. banc 1984) (recognizing as "common knowledge that counties and municipalities throughout [Missouri] have enacted housing and property maintenance codes which impose on property owners, including landlords, responsibilities with respect to the maintenance of property").

15

These changes in leasing practices and duties of a landlord led the Missouri Supreme Court to place the impetus for repair squarely on the landlord, not the tenant:

> The rule that the tenant must make repairs was probably fair when applied in an agrarian economy where the materials for repairs were simple and at hand, and the tenant capable of making them himself. At least as concerns the actual making of repairs, the rule seems archaic and completely out of harmony with the facts when applied in a complicated society to urban dwellings occupied by persons on salary or weekly wage. . . . It would seem that the lessor is in the better position, from the viewpoint of economic situation and interest, to make repairs, and that the tenant ought to have no duty in the absence of a specific covenant.

*Minton v. Hardinger*, 438 S.W.2d 3, 7 (Mo. 1968). All of these changes were enacted to ensure that leased dwellings remain safe and sanitary. *Cf. Detling*, 671 S.W.2d 265 at 270.

But health and safety are not the only ways in which Missouri has elected to regulate its rental economy. The Missouri Human Rights Act also regulates *who* a landlord can select as tenant, disallowing the refusal to rent to "any person because of race, color, religion, national origin, ancestry, sex, disability, or familial status." RSMo. § 213.040.1(1). This same statute regulates the content of a landlord's advertisement of a rental unit. RSMo. § 213.040.1(3). And it requires a landlord to make physical changes to the rental unit to rent to a person with a disability. RSMo. § 213.040.2.

The City has added additional regulations to the landlord/tenant relationship. In 2018, the City enacted Healthy Homes which establishes an "inspection program . . . to protect the public health, safety and welfare in residential rental property units through establishment of minimum health and safety standards." K.C. Code § 34-830. The initiative requires a valid rental permit for each residential rental unit in the City. K.C. Code § 34-832(a). To qualify for such a permit, the landlord must "[a]gree to allow representatives of the [City] access to the rental property for the purpose of inspections," as well as "[s]ubmit a health and safety inspection report . . . ." K.C. Code

16

§ 34-835. The inspections allowed are both complaint driven and "a percentage of random annual routine inspections to be completed based on the total number of permitted rental properties." K.C. Code § 34-846(b). Healthy Homes establishes a prohibitions on the landlord, such as limiting housing discrimination, limiting the amount of deposit, restricting the landlord's access to the unit and explicitly incorporating the state law concerning landlords and tenants. K.C. Code § 34-848.1. The City has also added several categories of protected characteristics that cannot be used in determining the appropriate tenant for a property. In addition to the traditional race, sex, color, disability, and familial status of the Fair Housing Act and MHRA, the City added protected characteristics such as marital status, age, and domestic violence status. K.C. Code § 38-105.

Finally, the ability to conduct inspections by housing authorities is needed or required because safe and healthy rental properties are essential to public welfare. The residential rental industry is rarely struck with large-scale disasters such as the condominium collapse in Surfside, Florida, in 2021; it is much more customary to see balcony collapses due to dry rot, fires due to faulty wiring, or infestation of vermin. In fact, "[a]n increasing body of evidence has associated housing quality with morbidity from infectious diseases, chronic illnesses, injuries, poor nutrition, and mental disorders." James Krieger, Donna L. Higgins, *Housing and Health: Time Again for Public Health Action*, 92 Am. J. Pub. Health 758, 758 (2002) (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC1447157/pdf/0920758.pdf, last visited 10/22/24). Lack of safe drinking water, absence of hot water for washing, ineffective waste disposal, infestation, and crowding all contribute to infectious disease, while damp, cold, and mold can contribute to chronic respiratory symptoms such as asthma. *Id.* "Old, dirty carpeting, often found in substandard housing, is an important reservoir for dust, allergens, and toxic chemicals. Exposure to these agents can result in allergic, respiratory, neurological, and hematologic illnesses." *Id*. "Deviation of

indoor temperature beyond a relatively narrow range has been associated with increased risk of cardiovascular disease." *Id.* at 759. Substandard housing can also increase exposure to toxic substances such as lead, nitrogen dioxide from inadequate ventilation or poorly functioning combustion appliances, carbon dioxide from poorly functioning heating systems, asbestos, and PVC flooring and textiles, all of which can increase asthma, headache, neurodevelopmental abnormalities, hypertension, cancer, and bronchial obstruction. *Id.* And "people of color and people with low income are disproportionately affected. For example, Blacks and low-income people are 1.7 times and 2.2 times more likely, respectively, to occupy homes with severe physical problems compared with the general population." *Id.* at 760.

The only conclusion, after looking at the length of regulation of the residential rental business, the widespread and far-reaching regulations, the continuous reach of the government into the industry, and the public safety implications of failing to enact such regulations, is that the residential rental industry is a closely regulated industry.

### b. The warrantless inspection required by Section 8 meets the *Burger* test for closely regulated industry warrantless inspections.

Because the rental industry is closely regulate, the City must still meet the *Burger* test for warrantless inspection. As stated above, the Supreme Court established a three-part test to establish whether a warrant is needed for a closely regulated industry: substantial government interest; inspections that further the government interest; and advice that a search is being made and limit to the discretion of the inspecting officers. All three elements are met here.

For the past century, Missouri, as well as states and localities nationwide, has recognized and placed more substantial limitations on the rights of landlords with the goal of providing housing that is both safe and healthy. And Missouri is not alone in that goal: the Section 8 scheme, itself, was enacted "[f]or the purpose of aiding low-income families in obtaining a decent place to

18

live and of promoting economically mixed housing . . . ." 42 U.S.C. § 1437f(a); *see also* 42 U.S.C. § 1437 (declaration of policy). That substantial government interest is supported by the need for safe, healthy, and affordable rental units.

And Section 8 inspections further that governmental interest. Section 8 inspections, performed by the federal government and its employees and contractors, ensure that the housing stock is both safe and healthy, by monitoring repairs, inspecting living conditions, and ensuring a lack of infestation.

Finally, Section 8 inspections meet the two basic functions of a warrant, i.e., "advise the owner of the commercial premises that the search is being made pursuant to the law and [have] a properly defined scope, and it must limit the discretion of the inspecting officers." The Housing Authority of Kansas City ("HAKC") does four types of inspection: initial lease-up, annual, compliant, and reinspection. An initial lease-up inspection occurs when a voucher holder leases a specific unit for the first time. The inspection occurs only when a landlord says the unit is ready for inspection. The annual inspection occurs every year coinciding with the anniversary date of the move-in. HAKC provides three weeks' advanced notice to both the tenant and the landlord of the inspection date. Compliant inspection occurs when a complaint is made that there is a deficiency in housing quality standards. If the deficiency is life-threatening, the inspection is scheduled within one business day, otherwise, the inspection is scheduled within five business days. Finally, if a unit fails one of the previously enumerated inspections, a reinspection will occur within twenty-five to thirty days after the failed inspection. Notice is given at the time of the failed inspection and again when the deficiency notice is sent. The Plaintiffs, then, have anywhere from one business days' notice to thirty days' notice of an inspection, depending on the type of inspection being performed.

Nor is an inspector's discretion unfettered. The U.S. Department of Housing and Urban Development has approved form HUD-52580-A (*available at* https://www.hud.gov/sites/dfiles/OCHCO/documents/52580A.PDF, last visited 10/22/24) to guide an inspector's inspection. That form lists each room to be reviewed, the items in the room that should be inspected, and provides guidance for each element of the inspection checklist. For example, when an inspector looks for "electrical hazards," HUD has defined that to mean "broken wiring; non-insulated wiring; frayed wiring; improper types of wiring, connections, or insulation . . . ." An "unsound or hazardous wall condition" is defined as "serious defects such that the structural safety of the building is threatened, such as severe buckling, bulging or leaning; damaged or loose structural members; large holes; air infiltration."

Undoubtedly, Plaintiffs will assert that *Los Angeles v. Patel* curtailed and supplanted the *Burger* test for closely regulated industries, but this is not so. *Patel*, in fact, reaffirmed the *Burger* test and applied it to Los Angeles' hotel register search ordinance. *See* 576 U.S. at 426-27. Instead, it found that the search lacked pre-compliance review. *Id.* at 419. Such pre-compliance review is not lacking from the Ordinance.

The *Patel* court defined pre-compliance review as a way to "question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it . . . ." *Id.* at 420 (quoting *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984)). The City, however, has an extensive investigation and finding procedure that allows for extensive review before any penalties are imposed upon a landlord. As stated above, the Ordinance does not require a landlord to participate in Section 8 and does not impose any penalties on them for their failure to so participate. Rather, the Ordinance only prohibits a landlord from discriminating against a potential lessee on the basis of their lawful income.

If a lessee believes they have been discriminated against on such grounds, there is not an automatic penalty. Rather, they are required to file a report of discrimination with the City's Civil Rights Enforcement Office (CREO). K.C. Code § 38-23 (a)(1). Upon receiving the complaint, CREO will investigate the complaint. K.C. Code § 38-23(c). As a part of that investigation, CREO will send notice to the entity allegedly engaging in discrimination, advising them of their procedural rights and obligations K.C. Code § 38-23(c)(3). There is then an investigation during which a landlord can explain its reason why refusing to rent to a Section 8 recipient is not source-of-income discrimination. *See* K.C. Code § 38-23(c)(4). CREO will then issue a determination finding probable cause or no probable cause. K.C. Code § 38-23(d) and (e). If



no probable cause is found, there, again, is no penalty imposed on the landlord. *See* K.C. Code § 38-23(d). Only upon a finding of probable cause and a lack of conciliation is a potential penalty imposed. *See* K.C. Code § 38-23(f). As such, given the lengthy pre-compliance review, the City's Ordinance does not fall victim to the same deficiencies as were found in *Patel*.

**5. The City is not preempted by federal law in requiring landlords to not discriminate against those with Section 8 vouchers.**

As stated, *supra*, the City's ordinance does not require landlords to participate in Section 8. However, even if the City did require Section 8 participation, such a requirement would not be

preempted by the voluntary participation allowed, but not required, by federal law. As such, the City does not violate the Supremacy Clause as posited by the Plaintiffs, and there is a low likelihood of success on the merits of this argument.

Plaintiffs argue that the City's Ordinance is preempted by conflict preemption, i.e. that the City's ordinance is an obstacle to federal purposes or frustrates the purposes of federal law. *See* Doc. 3, p.10.[4] This requires a determination that the challenged law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). "What qualifies as 'a sufficient obstacle is a matter of judgment to be informed by examining the federal statute as a whole and identifying its purpose and intended effect.'" *Pharm. Research and Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1144 (8th Cir. 2024) (quoting *Crosby*, 530 U.S. at 373). Only "[i]f *the purpose* of the act cannot otherwise be accomplished" must the challenged law "yield to the regulation of Congress . . . ." *Crosby*, 530 U.S. at 373 (emphasis supplied); *see also Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case."). All of this analysis must be done with an eye toward the fact that "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did *not* intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (emphasis supplied).

---

[4]     Nor could Plaintiffs argue another type of preemption. "On its face, 42 U.S.C. § 1427f contains no express preemption clause. Furthermore, the federal statute does not 'occupy the field' so comprehensively that states implicitly are prohibited from acting in the arena of low income housing assistance. Indeed, 42 U.S.C. § 1437f explicitly contemplates state and local participation in the section 8 program. See, e.g., 42 U.S.C. § 1437f (b) (authorizing secretary of HUD to enter into contracts with local public housing authorities); 42 U.S.C. § 1437f (d) (authorizing local public housing authorities to enter into housing payments contracts with landlords)." *Comm'n on Human Rights and Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 246 (Conn. 1999).

Because the purpose of the Section 8 program must be determined prior to an obstacle-conflict analysis, examination of the text and structure of the law is instructive. *See Va. Uranium, Inc. v. Warren*, 587 U.S. __ (2019) (consulting "text and structure" of federal law to discern preemptive scope). In 1974, Congress amended the federal housing law to create Section 8, with the intention of aiding "low-income families in obtaining a decent place to live by subsidizing private landlords who would rent to low-income tenants." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 12 (1993).

> Under the program, tenants make rental payments based on their income and ability to pay; the Department of Housing and Urban Development (HUD) then makes "assistance payments" to the private landlords in an amount calculated to make up the difference between the tenant's contribution and a "contract rent" agreed upon by the landlord and HUD.

*Id*. This federal program was enacted "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing . . . ." 42 U.S.C. § 1437f(a); *see also* 42 U.S.C. § 1437 (declaration of policy). Notably absent in the federal text is a requirement that states or local governments leave participation voluntary.

And HUD, the federal agency administering Section 8, is aware of source of income discrimination laws. For example, in the 1990s, HUD proposed new regulations, "one of which required [public housing authorities] to administer the tenant-based program in accordance with 'equal opportunity and other HUD requirements.'" *Montgomery Cnty. v. Glenmont Hills Assocs.*, 936 A.2d 325, 336 (Md. 2007) (quoting 58 FR 11292 (Feb. 24, 1993)). When adopting the final regulations, HUD stated:

> Comments recommend that the rule should require [housing authority] compliance with State and local fair housing laws. HUD believes that the federal program rule and program enforcement should only require compliance with federal fair housing requirements. *State and local governments can of course impose*

> *additional requirements. The federal regulation is not intended to pre-empt the operation of such State or local laws.*

60 FR 34660, 34662 (July 3, 1995) (emphasis supplied).

Subsequently, in May 1999, HUD proposed an interim regulation, eventually codified as 24 CFR § 982.53(d) which provides:

> Nothing in part 982 is intended to pre-empt operation of State and local laws that prohibit discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder. However, such State and local laws shall not change or affect any requirement of this part, or any other HUD requirements for administration or operation of the program.

When this regulation was proposed, it contained only reference to "State laws that prohibit discrimination." When adopting the final rule in October of 1999, HUD noted a comment that the regulation in § 982.53(d) needed to be expanded to include *local* ordinances as well. The comment observed that "[t]hese tools are used increasingly by local communities to promote fair housing." HUD agreed, revising the language to reference "State *and local* laws that prohibit discrimination." *See* 64 FR 56894, 56896 (Oct. 21, 1999) (emphasis supplied).

This should be seen as conclusive evidence that the federal government both knows of local laws such as the Ordinance and approves of those laws. That type of evidence was persuasive to the United States Supreme Court in *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405 (1973). There, the Supreme Court noted that, at the time of passage of the federal work rules in Social Security, "21 States already initiated welfare work requirements as a condition of AFDC eligibility." *Id.* at 414. Because the state laws already existed, "[i]f Congress had intended to pre-empt state plans and efforts in such an important dimension . . . such intentions would in all likelihood have been expressed in direct and unambiguous language. No such expression exists, however, in either the federal statute or in the committee reports." *Id.* The conclusion the Supreme

Court draws from the lack of *express* preemption in the face of already existing state laws, was that no preemption was intended.

Here, state and local laws barring source of income discrimination, including Section 8 vouchers, have been around for decades – a fact known to HUD and presumably known to Congress. For example, *Franklin Tower One v. N.M.*, 725 A.2d 1104 (N.J. 1999) upholds a New Jersey law enacted in 1981, and *Attorney General v. Brown*, 511 N.E.2d 1103 (1987), upholds a Massachusetts law in place by at least 1984. There are, in fact, dozens of states, counties, and cities that have source of income discrimination laws on the books. In addition, as Plaintiffs note, Section 8 has been amended in the years since these source of income discrimination laws have been enacted. *See* Doc. 3 p.13 (referencing the repeal of the "take one, take all" and "endless lease" provisions in 1998). Had Congress truly intended to preempt state and local source of income discrimination laws which had been on the books 20 years at that point, it could "have been expressed in direct and unambiguous language" at that time. As no such expression exists, this Court should presume that Congress did not intend to preempt source of income discrimination laws such as the Ordinance.

Plaintiffs' argument, then, must hinge

> on the assumption that, because the Federal law does not, itself mandate participation by landlords, voluntary participation somehow lies at the heart of the Congressional purpose – that it was more important to Congress that the States and counties protect the right of landlords not to participate in HCVP than that they promote the *declared* goal of enlarging the stock of private housing available to low-income families by prohibiting discrimination based on Section 8 vouchers.

25

*Montgomery Cnty.*, 936 A.2d at 336 (emphasis supplied). Yet every court that has considered this argument has rejected it[5] because "the voluntary nature of the Section 8 program is not at the heart of the federal scheme." *Franklin Tower One, LLC v. N.M.*, 725 A.2d 1104, 1113 (1999). *See also Austin Apartment Ass'n v. City of Austin*, 89 F.Supp.3d 886, 895 (W.D. Tex. 2015) ("the purposes and objectives of [Section 8] are 'to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families,' not to protect landlords' rights"); *Bourbeau v. Jonathan Woodner Co.*, 549 F.Supp.2d 78, 88-89 (D.D.C. 2008) (prohibiting discrimination against voucher holders will "advance rather than denigrate" Congress's objectives); *Montgomery Cnty. v. Glenmont Hills Assocs.*, 936 A.2d 325, 336 (2007) ("There is nothing in any of the relevant Federal statutes even to indicate, much less establish, that voluntary participation by landlords was an important congressional objective. The only declared objective is to assist State and local governments in expanding affordable housing for low-income families . . . ."); *Comm'n on Human Rights & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 246 (1999) ("Requiring landlords to extend rental opportunities to otherwise eligible section 8 recipients . . . is not an obstacle to the congressional agenda but serves instead to advance its remedial purpose"); *Attorney General v. Brown*, 511 N.E.2d 1103, 1106 (1987) (helping low-income families obtain decent housing, not

---

[5]      A sole *possible* exception is *Knapp v. Eagle Prop. Mgmt.*, 54 F.3d 1272 (7th Cir. 1995). The question presented in *Knapp*, however, was whether Section 8 vouchers were "income" as defined by Wisconsin's source of income discrimination statute; the Seventh Circuit held they were not. *Id.* at 1282. After so holding, and in dictum, the court then noted that it was "questionable, however, to allow a state to make a voluntary federal program mandatory." *Id*. Each court has declined to follow the dictum in *Knapp* after performing its own preemption analysis. *See, e.g., Austin Apartment Ass'n*, 89 F.Supp.3d at 896 (finding, in distinguishing *Knapp*, that "the decisions from those courts directly presented with the federal preemption question [are] far more persuasive than dicta from those which were not"); *Montgomery Cnty.*, 936 A.2d at 338 (electing to follow non-preemption decisions rather than the "*dicta in Knapp* . . . with which we disagree").

voluntary landlord participation, is at the heart of the federal scheme), *superseded by statutory amendment by* G.L. c. 151B, §4(10) (changing the elements of source of income discrimination).

In *Austin Apartment Ass'n*, the plaintiff made this same argument, namely that the challenged law stood as an obstacle to the execution of the Fair Housing Act, by making participation in the voucher program mandatory, rather than voluntary. 89 F. Supp. 3d at 894-895. The Court disagreed, stating that this has not only been rejected by every court that has reviewed this issue, but that the ordinance's purposes and objectives served the same purpose as the federal law, "by increasing the number of houses and apartments available to voucher holders, and in doing so, 'advanc[ing] rather than denigrat[ing]' the Program's objectives." *Id.* at 895-896 (citing 42 U.S.C. § 1437(a)(1)(A)). It also could not be preempted because HUD's federal regulations "specifically provide the federal statutes creating it are not intended 'to pre-empt operation of State and local laws that prohibit discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder." *Id.* at 896 (citing 24 C.F.R. § 982.53(d)).

The court in *Bourbeau v. Jonathan Woodner Co.* also rejected the argument. There, the court found it was plainly inaccurate to assume that a reading of the act prohibited "discrimination against voucher holders on the basis of their status as voucher holders" to require mandatory participation in the program. 549 F. Supp. 2d at 87. This is because "[l]andlords remain free not to rent to voucher holders provided they do so on other legitimate, non-discriminatory grounds, such as an applicant's rental history or criminal history" and because the federal voucher program

> requires participants to rent units with rental costs in a particular range. If a landlord charges rents that are too high for the Housing Choice Voucher Program—assuming he or she does so for non-discriminatory reasons—he or she is not compelled to lower rents in order to permit voucher holders to rent those units.

*Id.* (citing *Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre*, 936 A.2d at 330, 334 n.7; *see also* 24 C.F.R. § 982.307(a)(3) ("'The owner is responsible for screening of [voucher holders] on the basis of their tenancy histories,' including such things as drug-related criminal activity, rental payment history, and care of premises")). The court also reasoned that "prohibiting discrimination on the basis of a voucher holder's status as a voucher holder would not conflict with federal law" because "a non-discrimination requirement would neither compel nor permit parties to violate any provision of the Housing Choice Voucher Program" and it would "not stand as an obstacle to the Housing Choice Voucher Program's central objective" to aid low-income families in obtaining housing. *Id.* at 88 (internal citations omitted). The federal regime solely "creates the scheme and sets out the guidelines for the funding and implementation of the program;" it does not preclude local ordinances and/or state regulation. *Id.* (internal citations omitted). And the non-discrimination provision "'advance[s] rather than denigrate[s]' that objective." *Id.* (internal citation omitted).

Plaintiffs' argument that the repeal of the "take one, take all" and "endless lease" provisions of Section 8 make voluntary participation an essential part of Section 8 is likewise misplaced. It is true that Congress believed these provisions were "administrative burdens to landlords" and that repeal would make Section 8 "more attractive to private landlords and increase housing choices for lower income families." Even in the repeal, however, the consideration was still on increasing housing choices for lower income families – the true purpose of Section 8. Further, in rejection of Plaintiffs' assertion that states are preempted from regulating Section 8, Congress explicitly stated that it did "not anticipate that the repeal of these rules [would] adversely affect assisted households because protections will be continued under State, and local tenant laws." S. Rep. No. 105-21, at

36 (1997). "The intent of the repeals is not to excuse discrimination against section 8 holders . . . ." *Id.*

Finally, Plaintiffs advance *Forest Park II v. Hadley* in support of their argument that the City is preempted by federal law. Doc. 3 at p.11-12. In *Forest Park II*, the Eighth Circuit held that a Minnesota state statute which imposed additional notice and reporting requirements on a federally subsidized housing landlord's prepayment of a mortgage was preempted by federal law. 336 F.3d 724, 733-34 (8th Cir. 2003). In relying on this case, Plaintiffs bypass the Court's comments that the "unique federal laws and programs involved in this case make it difficult to apply a traditional preemption analysis" and "unlike cases involving a field traditionally regulated by the states, there is no presumption against preemption in this case." *Id.* at 731. Plaintiffs also ignore the fact that the implied preemption language from *Forest Park II* is dictum, as the Eighth Circuit held that Minnesota's statute was expressly preempted by 12 U.S.C. § 4122. *Id.* at 732-33.

Setting aside these very important omissions and turning to the implied preemption dicta, the Court in *Forest Park II* explicitly held that Congress' "original intent" in passing the law was offering prepayment as an incentive. *Id.* at 733. Further, the Court held that, while the purpose and objective of Congress was to create low-income housing, "that within that goal was the desire to involve private developers in the process." *Id.* The additional state law requirements imposed by Minnesota "eviscerate" the federal law by making the state the "sole entity standing in the way of an owner's exercise of its federally granted right to prepay and withdraw from the program." *Id.* at 734. The Court of Appeals of Maryland dealt directly with the analogous issue for Section 8 holding that, unlike with the laws at issue in *Forrest Park II*, protection of landlords' rights are not more important than the "declared goal of enlarging the stock of private housing available to low-income families by prohibiting discrimination based on Section 8 vouchers." *Montgomery Cnty.*,

29

936 A.2d at 336. In other words, protection of landlords *is not* one of the "full purposes and goals of Congress" in enacting the Section 8 program. Therefore, required participation in the program would not be preempted – even if that is what the City's Ordinance does, which it does not. As a result, the *sole* case that lends *analogous* support to the Plaintiffs' preemption argument should be disregarded. Plaintiffs have no likelihood of success on the merits of preemption, and a preliminary injunction should not be granted on those grounds.

### B. Public interest, irreparable harm, and balance of the equities all require denial of a preliminary injunction.

Plaintiffs argue that, because they have shown "an actual or imminent threat to their exercise of their Fourth Amendment rights," Doc. 3 p.14-15, the other *Dataphase* factors balance in their favor. While it is true that "the public is served by the preservation of constitutional rights," *Phelps-Roper v. Nixon*, 545 F.3d 685, 694 (8th Cir. 2008), there are two fallacies with this argument. The first is that, as shown above, the Plaintiffs do not have the likelihood of success on either their Fourth Amendment or federal preemption arguments. Secondly, it ignores the interest of the tenants of the City.

The City has nearly 100,000 renter-occupied units.[6] Because housing production lags in the Kansas City region, there is currently a housing gap of 12,000 to 24,000 units. MARC, *Housing production in the Kansas City region continues to lag peer metros* (June 25, 2024), *available at* https://www.marc.org/news/economy-housing/housing-production-kansas-city-region-continues-lag-peer-metros (last visited 10/22/24). This underbuilding plays a significant role in the rapid

---

[6]     This data comes from the Greater Kansas City Regional Housing Partnership, *available at* https://experience.arcgis.com/experience/ff430550582544d587b764bd4601810e/page/Rental-Costs/?views=Income_City%2CRent_City%2CStock_City (last visited 10/22/24), filtered to include only rental units for Kansas City, Missouri. The RHP is a collaboration of the Mid-America Regional Council ("MARC") and Local Initiatives Support Corporation.

increase in housing prices and rents, leaving 64,000 households in the region unable to find affordable rents at current rates. *Id.*

The numbers are particularly troublesome for low-income individuals. The Joint Center for Housing Studies of Harvard University estimates that 29% of renters in the Kansas City region are cost burdened and 14.3% are severely cost burdened. JCHS, *Cost Burdens High Across the Country*, *available at* https://www.jchs.harvard.edu/son-2024-cost-burdens-map (last visited 10/22/24). That means that these households are spending 30% and 50% of their income, respectively, on housing. This is because rents in Missouri are amongst the fastest growing in the country; in 2023, rents rose 7% to a median of $1,644 per month. Savannah Hawley-Bates, *Rents in Kansas City and Missouri are rising faster than almost anywhere else in the U.S.*, (Feb. 28, 2024), *available at* https://www.kcur.org/housing-development-section/2024-02-28/rents-kansas-city-missouri-housing-prices-affordable-kc-tenants (last visited 10/22/24). Approximately 89% of those households with extremely low incomes cannot find affordable housing in the area. MARC, *More than 3 in 4 extremely low-income renters are severely cost-burdened* (May 20, 2024), *available at* https://marc.org/news/economy-housing/more-3-4-extremely-low-income-renters-are-severely-cost-burdened (last visited 10/22/24). This forces those that are cost-burdened to "make difficult choices about what they can afford, often leading to an inability to save for the future or pay for necessities like healthcare and food." *Id.* And it creates "disparities in homeownership, health and education, and contribute[s] to short-term or chronic homelessness." *Id.*

These disparities are disproportionately affecting Black, Latino, and Indigenous households, as these households are both more likely to be renters and to have extremely low incomes. "For example, 57% of Black households are renters, and 19% are extremely low-income

renters. Fifty-two percent of Latino households are renters, and 13% are extremely low-income renters. In contrast, 27% of white households are renters, and 6% are extremely low-income renters." Nat'l Low Income Housing Coalition, *The Gap: A Shortage of Affordable Homes*, at 15 (Mar. 2024). "Because people of color are also more likely than white people to be extremely low-income renters, affordable housing solutions designed to alleviate cost burdens for extremely low income renters advance racial equity further than solutions that target low- or middle-income renters." *Id.* at 16.

Source of income discrimination laws help alleviate these burdens. Jurisdictions with source of income antidiscrimination laws have voucher utilization rates that are 4 to 11 percentage points higher than jurisdictions without such laws. Lance Freeman, *The Impact of Source of Income Laws on Voucher Utilization and Locational Outcomes: Assisted Housing Research Cadre Report* 24 (2011), *available at* https://www.huduser.gov/publications/pdf/freeman_impactlaws_assistedhousingrcr06.pdf (last visited 10/22/24). Voucher holders in jurisdictions with source of income discrimination laws are 12 percent more likely to find a unit within the voucher's time limit than voucher holders in places without these laws. Meryl Finkel, Larry Buron, *Study on Section 8 Voucher Success Rates* 3-17 (Nov. 2001), *available at* https://www.huduser.gov/publications/pdf/sec8success.pdf (last visited 10/22/24). And rates of landlord acceptance of vouchers were higher in areas with source of income protections. Mary Cunningham, *A Pilot Study of Landlord Acceptance of Housing Choice Vouchers* 66, *available at* https://www.huduser.gov/portal/portal/sites/default/files/pdf/Landlord-Acceptance-of-Housing-Choice-Vouchers.pdf (last visited 10/22/24) (noting that "landlord discrimination against voucher holders was more common in jurisdictions without protections and less common where protections were in place"). The efficacy of these laws and the chronic

problems they address are the "public interest" which comes decidedly down on the side of the City's Ordinance.

The Plaintiffs also ignore the several other sources of income besides Section 8 vouchers, which would be open to discrimination if the law is overturned. In addition to Section 8 vouchers, the City's Ordinance protects against discrimination on the basis of cash income, Supplemental Security Income, Social Security Disability Insurance, child support, and tipped wages. By enjoining the enforcement of the Ordinance, these renters – not just participants in Section 8 – would be left without protection against landlords seeking to discriminate against the marginalized in our community.

Nor would Plaintiffs be irreparably injured. Thousands of landlords across the United States are inspected each year by HUD and its participant PHAs, all with the same notice, form, and criteria. Further, to establish the need for injunctive relief to avoid irreparable harm, the movant "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (internal quotation marks omitted). A mere "possibility of harm" is insufficient. *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). The City has demonstrated several ways in which a landlord can own a rental property in the City and still not participate in Section 8. Plaintiffs have made no attempt to show that they or their properties qualify for Section 8 such that they would be required to participate – if, indeed, the City required participation in the program. As it is the *Plaintiffs'* burden to prove the great, certain, and imminent harm needed for an injunction, their failure to show that they are subject to Section 8 is fatal to the irreparable harm element of the *Dataphase* test. *See Beber v. NavSav Holdings, LLC*, __ F.4th __, 2024 WL 4353525 at *4 (8th Cir. Oct. 1, 2024) ("Failure of a movant to show irreparable harm is

an independently sufficient basis upon which to deny a preliminary injunction." (internal citation and quotation omitted)).

## IV. CONCLUSION

The Ordinance does not compel participation in Section 8 and is not unconstitutional on its face. Nor have Plaintiffs shown that they or their properties are Section 8 eligible and therefore cannot show there is an as-applied challenge to constitutionality. Further, Plaintiffs Fourth Amendment rights have not been violated, nor is the City preempted from prohibiting source of income discrimination. For these reasons and those stated above, the Defendant, City of Kansas City, Missouri, respectfully requests that this Court deny the motion for preliminary injunction.

Respectfully submitted,

OFFICE OF THE CITY ATTORNEY

By: _/s/Tara M. Kelly_____
Tara M. Kelly, #64624
Senior Associate City Attorney
Jason C. Conkright, #58295
Assistant City Attorney
2300 City Hall, 414 E. 12th Street
Kansas City, Missouri 64104
Telephone: (816) 513-3117/3127
Facsimile: (816) 513-2716/2716
Email: tara.kelly@kcmo.org
           jason.conkright@kcmo.org
**ATTORNEYS FOR DEFENDANTS**
**CITY OF KANSAS CITY, MISSOURI**

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October 2024, a copy of the foregoing was sent to all counsel of record via ECF.

/s/ Tara M. Kelly_____
Tara M. Kelly

34