IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| KENNEDY F. JONES, STEPHEN J. VOGEL, | ) ) ) |
| Plaintiffs, | ) ) ) Case No. 4:24-cv00649-RK |
| v. | ) ) |
| CITY OF KANSAS CITY MISSOURI, | ) ) ) |
| Defendant. | ) |

**ORDER**

Plaintiffs Kennedy F. Jones and Stephen J. Vogel bring this case against Defendant City of Kansas City, Missouri (the "City"), challenging the constitutionality of Committee Substitute for Ordinance No. 23109 ("Ordinance"). Plaintiffs argue that the Ordinance violates the Fourth Amendment—as applied to the states and local governments through the Fourteenth Amendment—and the Supremacy Clause of the U.S. Constitution. Before the Court is Plaintiffs' motion for preliminary injunction. (Doc. 2.) The motion is fully briefed, (Docs. 3, 16, 21), and the Court held a hearing on the motion on January 28, 2025, (*see* Doc. 27). After careful consideration and review, the Court **ORDERS** that Plaintiffs' motion for preliminary injunction is **GRANTED**.

**Background**[1]

This case arises out of a recent amendment to Chapter 38 of the City's Code of Ordinances, which provides civil rights protections, including the prohibition of certain discriminatory housing practices.

Prior to August 1, 2024, the City Code prohibited landlords from refusing to rent to a tenant because of that tenant's "reasonably verifiable and lawful source of income." (Doc. 1-4 at 1, § 38-105(d)(10) (amended Aug. 1, 2024).) The ordinance defined "lawful source of income" as "the lawful manner by which an individual supports themselves or their dependents, including but not limited to pay, child support payments, and rental assistance from a federal, state, local or

---

[1] The Background information is derived from Plaintiffs' verified complaint and accompanying exhibits, as well as the City's Code of Ordinances.

nonprofit-administered benefit or subsidy program." (*Id.*) The ordinance provided specifically, though, that "[i]n no event shall an owner be compelled to participate in an otherwise voluntary benefit or subsidy program." (*Id.*)

On January 25, 2024, the City Council passed the Ordinance[2] amending Chapter 38, effective August 1, 2024. (Doc. 1-2 at 22.) The Ordinance's purpose is to promote fair housing and increase housing opportunities. Among other things, the Ordinance prohibits a landlord from refusing to rent to a tenant "because of a protected trait." (Doc. 1-2 at 9, § 38-105(d)(1).) As relevant here, § 38-105(b) of the amended Ordinance expanded the definition of a protected trait to include a tenant's "source of income," which is in turn defined as follows:

> *Source of income* . . . includes . . . any type of private, non-profit, or government assistance or payment such as federal Housing Choice Vouchers as authorized by Section 8 of the Housing Act of 1937, military pension payments, disability payments, court ordered payments, or any other form of reasonably verifiable and lawful income, including cash or tipped wages and payments from strike funds. Source of income includes the program requirements for any type of private, non-profit, or government assistance or payment, unless compliance with such requirements would require unreasonable structural modifications to the dwelling.

(Doc. 1-2 at 6, § 38-1(31).) Additionally, the Ordinance does not include the safe-harbor provision, previously included in § 38-105(d)(10) of the City Code, which ensured landlords would not be compelled to participate in an otherwise voluntary benefit or subsidy program.

The Ordinance provides a formal complaint and investigation procedure that may be initiated by a person claiming injury due to an allegedly discriminatory housing practice listed in § 38-105. (Doc. 1-2 at 7-9, § 38-23(a), (c).) The City can also initiate a complaint when it has reasonable cause to do so. (*Id.*) If a landlord is found to have engaged in a prohibited discriminatory practice based on source of income, the landlord is subject to a mandatory $1,000 fine, and if the landlord accrues more than one violation in a twelve-month span, their rental permits are subject to "special probationary status." (Doc. 1-2 at 9-10, § 38-101(b).)

Plaintiffs' constitutional challenges to the Ordinance rest on the definition of source of income as a protected trait as including "government assistance or payment such as federal Housing Choice Vouchers as authorized by Section 8 of the Housing Act of 1937," 42 U.S.C.

---

[2] Plaintiffs attached a copy of the Ordinance to the verified complaint. (Doc. 1-2.) The Ordinance has been codified at K.C. Code of Ordinances §§ 34-831, 34-834, 34-837, 34-855, 34-857, 38-1, 38-23, 38-101, 38-105, and 38-106.

2

§ 1437f *et seq.* [3] The Section 8 program is a federal program adopted "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing," and it provides "assistance payments . . . with respect to existing housing" for those who qualify. 42 U.S.C. § 1437f(a). The Section 8 program is administered by the United States Department of Housing and Urban Development ("HUD") and local public housing agencies ("PHA") in accordance with 42 U.S.C. § 1437f *et seq.* and regulations promulgated by HUD. Landlord participation in the Section 8 program is voluntary under the federal statute and HUD regulations. To participate in the program, a landlord's rental units must meet certain housing quality standards and voucher payment standards, including reasonable rent. 24 C.F.R § 982.1(a)(2).

Additionally, as part of the Section 8 program, participating landlords must enter a separate Housing Assistance Payments ("HAP") contract with the local PHA for each Section 8 tenant the landlord leases to in order to receive housing assistance payments from the PHA. By signing the HAP contract, the landlord agrees to the following provisions:

- "The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the [housing quality standards]." (Doc. 1-3 at 4.)

- "The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere." (*Id.* at 5.)

- "The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require." (*Id.* at 7.)

- "The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies." (*Id.*)

- "The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records." (*Id.*)

Parties cannot modify the HAP contract and must use it word-for-word. (*Id.* at 1.)

Plaintiff Kennedy Jones is a licensed real estate broker who has been in the residential rental property business for over thirty years. He owns two residential rental units within City

---

[3] Consistent with the parties' approach in their briefing, the Court will refer to the federal program enacted by Section 8 of the Housing Act of 1937 as "Section 8" or the "Section 8 program" and the Housing Choice Vouchers under the Section 8 program as "Section 8 vouchers."

limits.  In the past, Plaintiff Jones participated in the Section 8 program and accepted Section 8 vouchers at some of his rental units, but he has since elected to stop doing so.  Plaintiff Joseph Vogel has been in the residential rental property business since 2011.  He owns three residential rental units within City limits through his single-member limited liability companies, 2012 LLC and 2013 LLC.  Plaintiff Vogel has never participated in the Section 8 program nor accepted Section 8 vouchers for any of his rental units.  Both Plaintiffs intend to continue not to participate in the Section 8 program due to their concerns that doing so requires them to waive their Fourth Amendment rights, in addition to the other burdensome requirements of participating in the Section 8 program as landlords.

Plaintiffs filed their complaint in this case on October 4, 2024, (Doc. 1), and concurrently filed a motion for preliminary injunction, (Doc. 2).  Plaintiffs argue that the Ordinance is unconstitutional under the Fourth Amendment and Supremacy Clause of the U.S. Constitution, and therefore request that the Court enter a preliminary injunction enjoining the City from enforcing the Ordinance and requiring the City to take all necessary steps to maintain the status quo pending final resolution of the case.  (*Id.* at 3.)

Further facts are set forth as necessary.

## Legal Standard

The Eighth Circuit considers motions for preliminary injunctions based on the following factors: (1) the threat of irreparable harm to the plaintiff, (2) the state of balance between such harm and the injury that granting the injunction will inflict on other parties, (3) the probability the plaintiff will succeed on the merits, and (4) the public interest.  *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  "In balancing the equities no single factor is determinative." *Id.* at 113.  However, "[l]ikelihood of success on the merits is the most important factor . . . ." *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (cleaned up).

## Discussion

### I. Effect of the Ordinance

Plaintiffs challenge the Ordinance as violating the Fourth Amendment's prohibition against unreasonable searches and seizures and the Supremacy Clause.  A necessary premise of their arguments is that the Ordinance mandates that landlords participate in the Section 8 program.

4

Therefore, the Court begins with this preliminary question before analyzing the *Dataphase* preliminary injunction factors.

Plaintiffs argue that the Ordinance requires that they participate in the Section 8 program to the extent (1) the Ordinance prohibits as an unlawful housing practice a landlord's refusal to rent to a tenant based on the tenant's source of income when it includes or consists of a Section 8 voucher, and (2) that to rent to a Section 8 tenant, landlords must participate in the Section 8 program and satisfy the requirements of the Section 8 program (including entering the HAP contract which waives certain Fourth Amendment rights). For its part, the City argues first that Plaintiffs have not demonstrated that any of their properties are eligible for the Section 8 program, and thus the Ordinance does not mandate their participation, and second that the Ordinance does not mandate Section 8 participation for any landlord, even those with qualifying rental units. The City asserts that the Ordinance "simply prohibits landlords from engaging in a variety of discriminatory conduct on the basis of a renter's source of income," including "refusing to rent to a tenant" based on the source of their income. (Doc. 16 at 9; Doc 1-2 at 10, § 38-105(d)(1).)

The City's first argument—that Plaintiffs must show their rental units qualify for the Section 8 program—is unpersuasive. There is no bright line rule for when a unit satisfies the requirements of Section 8. *See* 24 C.F.R. § 982.1(a)(2) (requiring units to "meet program housing quality standards" and that rent be "reasonable"). Housing quality standards may vary, and in some cases may even be temporarily waived. *See* 24 C.F.R. § 5.705(a)(3); 24 C.F.R. § 982.405(j). Therefore, to definitively determine whether a rental unit qualifies, the landlord would have to agree to rent to a Section 8 tenant and begin the review and approval process with the local PHA. The City's argument on this point would require Plaintiffs to engage in the Section 8 approval process to pursue their case. The Court disagrees. It is enough that Plaintiffs have shown they own rental housing units within City limits and are thus subject to the Ordinance prohibiting source-of-income discrimination.

The City's second argument addresses the crux of the issue: Does the Ordinance mandate that landlords within the City participate in the Section 8 program? The Court construes this issue as one of statutory interpretation, which is a question of law for the Court. *See Pub. Water Supply Dist. No. 3 v. City of Lebanon*, 605 F.3d 511, 517 n.6 (8th Cir. 2010). When interpreting a state

5

statute, federal courts apply that state's rules of statutory construction.[4] *See Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015). In Missouri, the "primary rule of statutory interpretation is to give effect to the General Assembly's intent as reflected in the plain language of the statute at issue. This Court looks to canons of statutory interpretation only when the meaning of a statute is ambiguous or would lead to an illogical result that defeats the purpose of the legislation." *Id.* (citing *Ben Hur Steel Worx, LLC v. Dir. of Revenue*, 452 S.W.3d 624, 626 (Mo. 2015)).

The Court recognizes that the Ordinance does not explicitly mandate participation in the Section 8 program in any express language. However, taking the plain language of the provisions of the Ordinance together, the Court finds that the ultimate effect of the Ordinance is likely to mandate landlord participation in the Section 8 program. First, § 38-105(d)(1) prohibits refusing to rent to a tenant based on a protected trait. Second, § 38-105(b) states that the term protected trait includes source of income. Third, the Ordinance defines source of income to include "Housing Choice Vouchers as authorized by Section 8" and "the program requirements for any type of . . . government assistance or payment." (Doc. 1-2 at 6, § 38-1(31).) Taking these provisions together, the Ordinance prohibits refusing to rent to a tenant because their income includes Section 8 vouchers.[5] A landlord cannot have a Section 8 tenant, who generally uses Section 8 vouchers to pay at least a portion of their rent, in the landlord's rental unit without following the Section 8 program requirements.[6] Therefore, the Court concludes that since a landlord cannot refuse a tenant because Section 8 vouchers are part of their income, the likely

---

[4] Under Missouri law, ordinances are subject to the same rules of construction that govern statutory interpretation. *See O'Neal v. State Farm Fire & Cas. Co.*, 630 F.3d 1075, 1077 (8th Cir. 2011) (citing *Sunswept Props., LLC v. Ne. Pub. Sewer Dist.*, 298 S.W.3d 153, 159 (Mo. Ct. App. 2009)).

[5] During the preliminary injunction hearing, the City argued that only § 38-105(d)(10) explicitly mentions "vouchers." This section makes it unlawful to refuse to rent to a tenant solely on the basis of a rent-to-income ratio that does not take into account verifiable and lawful sources of income, such as vouchers. The City argues that the Ordinance prohibits nothing more with reference to Section 8 vouchers. The City's argument overlooks the fact that, under the plain language of the Ordinance, Section 8 vouchers are included within the definition of source of income as a protected trait. (Doc. 1-2 at 6, § 38-1(31).) Therefore, every mention of source of income in the Ordinance incorporates Section 8 vouchers by way of the defined term.

[6] Also during the preliminary injunction hearing, the City suggested that a landlord could have a Section 8 tenant who does not pay rent with Section 8 vouchers. The Court is not persuaded by this suggestion, given the time and effort it takes to obtain Section 8 assistance and that the purpose of providing Section 8 vouchers is to assist the recipient in obtaining housing by paying a portion of their monthly rent.

6

effect of the Ordinance is to mandate landlord participation in the Section 8 program, or else risk investigation and fines for engaging in an unlawful housing practice.[7] The Court proceeds with the remainder of its analysis accepting Plaintiffs' premise that the Ordinance requires landlords to participate in Section 8.

## II. Likelihood of Success on the Merits Favors Plaintiffs

There are two standards for the likelihood of success on the merits factor for analyzing a motion for preliminary injunction. Typically, a movant must only show a "fair chance" of succeeding on the merits to support preliminary injunction. The "fair-chance standard does not require the party seeking relief to show a greater than fifty per cent likelihood that he will prevail on the merits." *D.M. v. Minn. High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019) (cleaned up). However, there is a heightened "likely to prevail" standard for state statutes, which does require showing a more-than-50%-chance of prevailing. *Id.* at 1000. "Which of the two standards applies to a municipal ordinance depends upon the extent to which the challenged government action 'represents the full play of the democratic process' and thus deserves greater deference." *Phelps-Roper v. City of St. Charles*, 782 F. Supp. 2d 789, 792 (E.D. Mo. 2011) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 n.6 (8th Cir. 2008)). The Court finds Plaintiffs meet either standard (both "fair chance" or "likely to prevail") on their Fourth Amendment claim.

### A. Fourth Amendment Search and Seizure Claim

Plaintiffs argue that they are likely to succeed on the merits of their Fourth Amendment claim because the Ordinance coerces them into consenting to warrantless searches of their rental units and business records, and that warrantless searches conducted with coerced consent violate the Fourth Amendment.

The Fourth Amendment of the United States Constitution provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

---

[7] While the Court finds the plain language of the Ordinance sufficient to find it mandates Section 8 participation, even if it were ambiguous the Court's conclusion would be the same. Notably, the prior version of the City Code provided a safe harbor from requiring landlord participation in otherwise voluntary programs, like Section 8. (*See* Doc. 1-4, § 38-105(d)(10) (amended Aug. 1, 2024) ("In no event shall an owner be compelled to participate in an otherwise voluntary benefit or subsidy program.").) The safe harbor was omitted from the amended Ordinance. This omission is particularly telling in light of the recitals preceding the Ordinance, which clearly indicate an intent to increase Section 8 participation because "the program does not work as intended for many participants, primarily because property owners will not accept their vouchers." (Doc. 1-2 at 1.)

seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." It has been made applicable to state and local governments through the Fourteenth Amendment. *K.D. v. County of Crow Wing*, 434 F.3d 1051, 1054 (8th Cir. 2006) (recognizing incorporation of search and seizure clauses of Fourth Amendment). The Fourth Amendment's purpose is to protect individuals against unreasonable invasions by government officials. *Camara v. Mun. Ct. of San Fransisco*, 387 U.S. 523, 528 (1967). This protection extends to a person's home, as well as their place of business. *See Azam v. City of Columbia Heights*, 865 F.3d 980, 988-89 (8th Cir. 2017). "The Supreme Court has interpreted the Fourth Amendment as proscribing unreasonable searches and seizures that intrude upon a person's reasonable expectation of privacy." *Id.* at 989 (citing *Boyd v. United States*, 529 U.S. 334, 338-39 (2000)). "Under this test, a party asserting a violation of his or her reasonable expectation of privacy must show both: 1) 'an actual (subjective) expectation of privacy,' and 2) 'that the expectation [is] one that society is prepared to recognize as reasonable.'" *Id.* (citations omitted).

An exception to the Fourth Amendment's warrant requirement is consent by the person subject to the search. *Katz v. United States*, 389 U.S 347, 358 n.22 (1967). Whether consent was voluntary, and thus valid, "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). When consent is the product of coercion or duress, such as when a person faces penalties if he refuses to consent to the search, the consent is invalid, and the search violates the Fourth Amendment. *Id.*

In this case, the Ordinance attaches penalties to certain conduct, including refusing to rent to a tenant based on their source of income. Therefore, Plaintiffs argue, a landlord has two options: accept Section 8 tenants—despite not wanting to participate in the Section 8 program—and thus consent under coercion to the searches included in the Section 8 program in violation of his Fourth Amendment rights, or risk the penalties that may issue under the Ordinance for engaging in the unlawful housing discrimination practice of refusing to rent to someone because part of their income consists of a Section 8 voucher.[8] The City does not directly counter Plaintiffs' coerced-

---

[8] It is unclear whether the Ordinance's fine is civil or criminal in nature. In light of caselaw indicating both criminal and civil penalties may coerce consent, the distinction is immaterial to the Court's analysis. *Compare Dearmore v. City of Garland*, 400 F. Supp. 2d 894, 902 (N.D. Tex. 2005) (criminal penalties); *Pund v. City of Bedford*, 339 F. Supp. 3d 701, 712 (N.D. Ohio 2018) (referring to *City of Los Angeles v. Patel*, 576 U.S. 409 (2015)) (same), *with Landon v. City of Flint*, No. 16-11061, 2016 U.S. Dist. LEXIS 181541, at *13-14 (E.D. Mich. Nov. 30, 2016) (citing *Columbia Basin Apt. Ass'n v. City of Pasco*, 268 F.3d 791, 798 (9th Cir. 2001)) (civil penalties), *adopted by* 2017 U.S. Dist. LEXIS 9254 (E.D. Mich.

8

consent argument, but instead argues that a warrant (and by extension a warrant exception) is not required under the circumstances because (1) landlords do not have a reasonable expectation of privacy in their rental units and records, (2) landlords already consent to the searches included in Section 8 under Healthy Homes, and (3) the rental housing industry is a closely regulated industry.

### 1. Landlords Have a Reasonable Expectation of Privacy in Business Records

First, the City argues that Plaintiffs cannot demonstrate a likelihood of success on the merits of their Fourth Amendment claim because landlords do not have a reasonable expectation of privacy in their leased rental units and common areas of their rental properties. Plaintiffs, for purposes of this motion alone, take as true that they do not have an expectation of privacy in leased units and public spaces in rental properties. (Doc. 21 at 15.) *See Marcavage v. Borough of Lansdowne*, 826 F. Supp. 2d 732, 740 (E.D. Pa. 2011) (finding no expectation of privacy in unit leased to third party) (collecting cases); *Tarantino v. City of Hornell*, 615 F. Supp. 2d 102, 109 (W.D.N.Y. 2009) (same) (collecting cases); *Azam*, 865 F.3d at 990 (finding no expectation of privacy in rental property's common areas, like interior hallways and laundry rooms). Courts reason that, in rented units and public spaces, a landlord cannot have a reasonable expectation of privacy because those areas are open to other people.

However, Plaintiffs argue that they do have a reasonable expectation of privacy in other areas—particularly their business records.[9] The Supreme Court has implicitly found that hotel owners have a reasonable expectation of privacy in business records such as guest logs. *See City of Los Angeles v. Patel*, 576 U.S. 409, 421-23 (2015). *Patel* concerned an ordinance which required hotel owners to make guest information records available to the Los Angeles Police Department for inspection on demand without any method for pre-compliance review to challenge the scope of the inspection. *Id.* at 412. Failure to make such records available was punishable by six months in jail and a $1,000 fine. *Id.* at 413. The district court found that the plaintiffs' challenge failed because they lacked a reasonable expectation of privacy in the records subject to

---

Jan. 24, 2017); *MS Rentals, LLC v. City of Detroit*, 362 F. Supp. 3d 404, 417 (E.D. Mich. 2019) (granting summary judgment on plaintiff's Fourth Amendment claim where ordinance authorized warrantless, nonconsensual searches because the alternative to consenting was a civil blight violation citation).

[9] Plaintiffs also argue that they have a reasonable expectation of privacy in certain physical aspects of their rental units, such as portions of the property inaccessible to the public and unoccupied units. Without opining on the validity of this argument, the Court focuses on business records herein as the most relevant privacy interest.

9

inspection, and a three-judge panel of the Ninth Circuit Court of Appeals affirmed. *Id.* at 414. On rehearing *en banc*, however, the Ninth Circuit reversed and found that the business records of the hotel were private property and that the hotel has the right to exclude others from their content. *Id.* The Supreme Court affirmed, but unlike the Ninth Circuit below,[10] the Supreme Court did not explicitly state that hotel owners have a reasonable expectation of privacy in their business records. However, the Supreme Court's analysis implies as much.

Because the ordinance in *Patel* allowed law enforcement to inspect hotel guest records without a warrant, the Supreme Court's analysis focused on possible exceptions to the warrant requirement. This Court finds the Supreme Court's methodology instructive; that is, the Supreme Court's analysis of warrant exceptions is only necessary if the Supreme Court believed there was a reasonable expectation of privacy in the business records. Said another way, because a warrant is not required to conduct a search in the absence of a reasonable expectation of privacy, a warrant (or warrant exception) would only be necessary if hotel owners have a reasonable expectation of privacy in their business records.

The Supreme Court analyzed the *Patel* ordinance under two exceptions to the warrant requirement. The first exception discussed was termed the "administrative search exception."[11] The second exception was the "closely regulated industry exception."[12] The Supreme Court found the administrative search exception was not satisfied because there was no method for pre-compliance review of the inspection of the records. *Id.* at 421-23. The Supreme Court also rejected

---

[10] The Ninth Circuit explicitly held that the "'papers' protected by the Fourth Amendment include business records. . . ." *See Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013) (citing *Hale v. Henkel*, 201 U.S. 43, 76-77 (1906)).

[11] Inspections where no warrant is ever required may be reasonable where a special need makes the warrant and probable-cause requirement impracticable, and where the primary purpose of the inspection (search) is distinguishable from the general interest in crime control. This type of search is referred to by the Supreme Court as an "administrative search." *Patel*, 576 U.S. at 421.

The Supreme Court has held that absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity for pre-compliance review. *Id.* at 420. To date, the Supreme Court has never attempted to prescribe the exact form "an opportunity for pre-compliance review" must take. *Id.* One example of providing an opportunity for pre-compliance review is issuing administrative subpoenas before inspection. In that way, the subject of the search could move to quash the subpoena before any search were to take place. *Id.* at 421-23.

[12] Some industries pose such a clear and significant risk to the public welfare that exceptional government oversight is required. Because of this exceptional governmental oversight, there can be no reasonable expectation of privacy for proprietors in these high-risk industries. *Id.* at 424.

the City of Los Angeles's argument that the hotel industry was closely regulated. *Id.* at 424. Therefore, by analyzing two warrant exceptions and finding the ordinance and the searches it authorized lacking under both, the Supreme Court implicitly adopted the Ninth Circuit's position that hotel owners have a reasonable expectation of privacy in their business records.[13]

The parties here did not explicitly brief the administrative search exception discussed in *Patel*. During the preliminary injunction hearing, Plaintiffs argued that the exception was not applicable in this case because the only opportunity for review under the Ordinance comes after the City starts investigating a landlord. In addition, Plaintiffs argued this after-the-fact "review" is only to determine whether the landlord engaged in any discriminatory housing practice, not whether the scope of the search was proper. Therefore, there would be no pre-compliance review as required by *Patel*. The Court is persuaded by Plaintiffs' argument on this point.

The Court concludes that Plaintiffs likely have a reasonable expectation of privacy in their business records, and notes that the City has not provided any caselaw to the contrary. Here, Section 8 requires landlords to permit inspections of various business records. Therefore, by being forced to choose between complying with the Ordinance or facing penalties for engaging in an unlawful housing practice, it is likely landlords are being coerced to consent to inspection of their business records in which they have a reasonable expectation of privacy.

### 2. Authorized Searches of Business Records Are Broader under Section 8 than Healthy Homes

Second, the City claims that Plaintiffs have no reasonable expectation of privacy in their business records because they already consent to searches under the Healthy Rental Homes provisions of the City Code, K.C. Code § 34-830 *et seq.* ("Healthy Homes") which applies to landlords within city limits. Plaintiffs argue primarily that the scope of searches authorized under the Section 8 program is greater than the scope of any searches authorized by Healthy Homes, and secondarily that the City's argument depends on Healthy Homes' constitutionality—which Plaintiffs say is also questionable, though they do not bring a direct challenge to that program here.

---

[13] Caselaw regarding the closely regulated industry exception to the warrant requirement also supports finding that there is generally a reasonable expectation of privacy in business records, as such caselaw notes that the expectation of privacy in business records is diminished when the industry is closely regulated. *See Western States Cattle Co. v. Edwards*, 895 F.2d 438, 441 n.2 (8th Cir. 1999) (citing *New York v. Burger*, 482 U.S. 691, 700-01 (1987)).

11

Under Healthy Homes, a landlord must submit a health and safety inspection report and agree to allow inspections of rental property to obtain a permit from the City. K.C. Code §§ 34-832, -835. Section 8 authorizes a broader scope of searches of business records. For example, the HAP contract requires landlords to provide information about rents charged on other rental units and all accounts and records relevant to the HAP contract. This includes a right to examine, audit, make copies of, and access electronically any such records. Since the searches a landlord must consent to under Section 8 exceed those authorized by Healthy Homes, the fact that a landlord consents to searches under Healthy Homes would not diminish their reasonable expectation of privacy in their business records which can be searched pursuant to Section 8 by way of the HAP contract.

### 3. Rental Housing Is Not a Closely Regulated Industry

Finally, the City argues that the rental housing industry is a closely regulated industry in which warrantless inspections are permissible. The closely regulated industry exception to the warrant requirement is a narrow one, and the Supreme Court has only recognized four such industries—liquor sales, firearms dealing, mining, and running an automobile junkyard. *Patel*, 576 U.S. at 424 (rejecting argument that the hotel industry is closely regulated). This list is not exhaustive, and the Eighth Circuit has recognized several other industries as closely regulated. *See United States v. Jamieson-McKames Pharms., Inc.*, 651 F.2d 532, 537 (8th Cir. 1981) (pharmaceutical manufacturing); *United States v. Ruiz*, 569 F.3d 355, 357 (8th Cir. 2009) (commercial trucking); *Benigni v. Maas*, 12 F.3d 1102, 1993 U.S. App. LEXIS 31629, at *7-8 (8th Cir. 1993) (animal vendor); *W. States Cattle Co. v. Edwards*, 895 F.2d 438, 441 (8th Cir. 1990) (cattle stockyard, conceded by parties); *Bevely Cal. Corp. v. Shalala*, 78 F.3d 403, 408 (8th Cir. 1996) (nursing care facility, conceded by parties). However, the City points to no caselaw within the Eighth Circuit or otherwise that extends this exception to the rental housing industry. The Court will nevertheless proceed with the closely regulated industry analysis.

In determining whether an industry is closely regulated, courts look to "factors including the duration of the regulatory tradition; the comprehensiveness of the regulatory regime; and the imposition of similar regulations by other jurisdictions." *Patel*, 576 U.S. at 432 (Scalia, J., dissenting) (citations omitted). Another key trait is that the industry "poses a clear and significant risk to the public welfare." *Patel*, 576 U.S. at 424 (majority opinion). *Patel* also indicates that the relevant question is not the extent of regulation of an industry, but whether the regulations

12

applicable to the industry "put[] . . . owners on notice that their 'property will be subject to periodic inspections undertaken for specific purposes.'" *Id.* at 425. In *Patel*, the majority of the Supreme Court found that most of the regulations regarding the hotel industry did not implicate an expectation of privacy (e.g., laws obliging inns to provide suitable lodging, maintain a license, collect taxes, post their rates, etc.), and thus did not support a finding that the hotel industry is closely regulated, despite the large extent of regulations within the industry. *Id.* at 425.

Similarly, here, the City provided a laundry list of regulations applicable to the rental housing industry. (Doc. 16 at 17-23.)[14] But most of these regulations do not necessarily implicate a privacy interest such that they put owners on notice that their property will be subject to inspections. The clearest exception is Healthy Homes, which does authorize certain searches and can thus be said to implicate a privacy interest. However, Healthy Homes—which was adopted recently in 2018—is likely insufficient on its own to corrode landlords' expectations of privacy in their rental units, and particularly in their business records, to such a degree that the industry could be considered closely regulated. Ultimately, the Court is not convinced at this stage by the City's argument regarding the closely regulated industry exception.

A key aspect of a Fourth Amendment claim is the reasonable expectation of privacy in the property to be searched; in light of the foregoing, the Court finds Plaintiffs have sufficiently shown a likelihood of success on the merits of their Fourth Amendment claim to the extent Plaintiffs have shown (1) that landlords have a reasonable expectation of privacy in their business records, (2) that the Ordinance requires their participation as landlords in the Section 8 program, and (3) that their consent to the warrantless searches under the Section 8 HAP contract is coerced, making such consent invalid. Therefore, warrantless searches conducted under these circumstances would support finding a Fourth Amendment violation.

B.  **Federal Preemption Claim**

Plaintiffs also argue that the Ordinance is preempted by federal Section 8 legislation in violation of the Supremacy Clause of Article IV of the Constitution. Specifically, Plaintiffs argue that the Ordinance is preempted by Section 8 because the Ordinance makes landlord participation

---

[14] At the federal level, for example, landlords must comply with the Fair Housing Act, Americans with Disabilities Act, Fair Credit Reporting Act, Fair Debt Collection Practices Act, Lead-Based Paint Disclosure Act, and the Protecting Tenants at Foreclosure Act. (Doc. 16 at 17.) At the state and local level, regulations may include (depending on the jurisdiction) protections of the tenant when living in substandard living conditions, rent control, antidiscrimination laws, limitations on rights to evict tenants, and more. (*Id.* at 18-21.)

13

in Section 8 mandatory, whereas federal Section 8 legislation leaves landlord participation voluntary. Having found that Plaintiffs demonstrated a likelihood of success on the merits of their Fourth Amendment claim, however, the Court need not reach a determination on the likelihood of success of their preemption claim at this stage. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) ("The plaintiff need only establish a likelihood of succeeding on the merits of any one of their claims." (cleaned up)); *D.M. v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019) ("Because we conclude that the boys have a fair chance of prevailing on the merits of their equal protection claim, we need not address their probability of success on their Title IX claim.").

### III. Threat of Irreparable Harm Favors Plaintiffs

Plaintiffs argue that the Ordinance poses an actual or imminent threat to their freedom from unreasonable searches and seizures guaranteed by the Fourth Amendment, which they contend supports a finding that they will suffer irreparable harm in the absence of an injunction. The City argues that Plaintiffs cannot show irreparable harm because their constitutional claims are unlikely to succeed. However, as explained above, the Court finds that Plaintiffs are likely to succeed on the merits of their constitutional challenge to the Ordinance under the Fourth Amendment. This leaves the City's argument that Plaintiffs have not shown that the Fourth Amendment harms are sufficiently certain or imminent to support a finding of irreparable harm.

Ultimately, the "burden [is] on [the movant] to establish the threat of irreparable injury." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). In doing so, Plaintiffs must show that they have "no adequate remedy at law because [their] injuries [could not] be fully compensated through an award of damages." *Mgmt. Registry, Inc. v. A.W. Cos.*, 920 F.3d 1181, 1183 (8th Cir. 2018) (citation and internal quotes omitted). To establish irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). However, "the alleged harm need not be occurring or be certain to occur before a court may grant relief." *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1037.

"In cases alleging constitutional harm, demonstrating a likelihood of success 'ordinarily warrants a finding of irreparable harm.'" *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 119 (D. Minn. 2021) (citing *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) ("The denial of a constitutional right ordinarily warrants a finding of irreparable harm, even when the

violation persists for "minimal periods" of time.")); *Stroeber v. Comm'n Veteran's Auditorium*, 453 F. Supp. 926, 933-34 (S.D. Iowa 1977) (finding irreparable harm from Fourth Amendment violation). The Eighth Circuit has upheld grants of preliminary injunctions where the irreparable harm factor is supported by the likely violation of a constitutional right. *See Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) (First Amendment); *McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir. 1984). In *McDonell*, the Eighth Circuit affirmed the granting of a preliminary injunction where the trial court found a likelihood of success on the merits of the plaintiffs' Fourth Amendment claims, and from that concluded irreparable harm.[15] *McDonell*, 746 F.2d at 787 (stating, in relation to a Fourth Amendment claim, that "[t]he violation of privacy in being subjected to the searches and tests in question is an irreparable harm . . . .").

During the preliminary injunction hearing, the City argued that Plaintiffs could not show irreparable harm because only two source-of-income discrimination complaints have been filed to date and neither concerned Section 8 vouchers. The Court is not convinced that the lack of prosecution for source-of-income discrimination to date makes the potential harm to Fourth Amendment rights any less clear or imminent.[16] The Ordinance permits prospective tenants to file complaints and the City itself to instigate investigations for good cause at any time. Landlords like Plaintiffs fear that the Ordinance will be used against them should they deny a Section 8 tenant. In this way, the Ordinance is already harming their freedom to exercise their Fourth Amendment rights.[17]

---

[15] Other circuits have more explicitly applied a presumption of irreparable harm upon finding a likelihood of success of the merits of a Fourth Amendment claim. *See, e.g.*, *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) ("[W]e agree with the district court—given the fundamental right involved, namely, the right to be free from unreasonable searches—that [plaintiff] has sufficiently demonstrated for preliminary injunction purposes that he may suffer irreparable harm arising from a possible deprivation of his constitutional rights."); *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (finding plaintiffs' Fourth Amendment claims are likely to succeed, and that "[b]ecause there is a likely constitutional violation, the irreparable harm factor is satisfied"). *But see Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204-05 (3d Cir. 2024) (rejecting presumption of irreparable harm in Second Amendment context, distinguishing special features of First Amendment law).

[16] The Ordinance went into effect August 1, 2024, and the contours of its enforcement are still developing. The first annual report on source-of-income discrimination is not due to the Mayor and City Council until June 1, 2025. (*See* Doc. 1-2 at 14.)

[17] Additionally, the City raised the question of Article III standing for the first time at the preliminary injunction hearing. The City argued that Plaintiffs have not shown an injury-in-fact because no complaint had been filed against these Plaintiffs (or any other landlord) for source-of-income discrimination at the time Plaintiffs filed the complaint in this case. However, this argument is contrary to

Since the Court found that Plaintiffs have a likelihood of success on the merits of their Fourth Amendment claim, it also concludes that Plaintiffs have shown they would suffer a threat of irreparable harm in the absence of a preliminary injunction.

## IV. The Balance of Harms and Public Interest Favor Plaintiffs

Finally, the Court considers the balance of harms and public interest. The "'balance of harms[]' requires the court to consider 'the balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties . . . .'" *See McLeodUSA Telcoms. Servs. v. Qwest Corp.*, 361 F. Supp. 2d 912, 921 (N.D. Iowa 2005) (citing *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994)). The public interest factor, on the other hand, requires the Court to consider the interests of the broader public. *See Pavek v. Simon*, 467 F. Supp. 3d 718, 761 (D. Minn. 2020). The balance of harms and public interest factors "merge when the Government is the party opposing the preliminary injunction." *Morehouse Enters., LLC v. BATFE*, 78 F.4th 1011, 1018 (8th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Two subgroups of the public have conflicting interests with regard to the Ordinance: landlords and tenants. For landlords in the City, requiring participation in the Section 8 program imposes several administrative burdens, including going through the approval process with the local PHA, and more importantly entering the HAP contract under the coercion of the Ordinance prohibiting unlawful discriminatory practices by landlords. For low-income tenants in the City, the Ordinance may increase the availability of affordable housing to their benefit.

---

a line of pre-enforcement cases finding Article III standing satisfied in similar circumstances.

"In pre-enforcement cases . . . injury in fact exists when the plaintiffs allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *Alexis Bailey Vineyard Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). While "enforcement history is relevant to [the] analysis, it is not determinative. Rather, when a course of action is within the plain text of a statute, a 'credible threat of prosecution' exists." *Id.* (citing *North Dakota v. Heydinger*, 825 F.3d 912, 917 (8th Cir. 2016)). This is true even when there has been no enforcement of the legislation, particularly when the legislation is new. *See St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) ("Given the relatively short time that has passed since enactment, we certainly cannot say that Minnesota has established a state policy of not enforcing the Minnesota Statutes.").

Here, Plaintiffs attached sworn affidavits to their verified complaint stating that they "do not intend to accept Section 8 vouchers, participate in the Section 8 program, or sign any HAP contracts." (Doc. 1-10 at ¶ 16; Doc. 1-11 at ¶ 17.) In light of the Court's interpretation of the Ordinance above, this intended course of action by Plaintiffs is proscribed by the Ordinance, and thus a credible threat of prosecution exists. Therefore, Plaintiffs have sufficiently shown an injury-in-fact to support Article III standing.

At the same time, however, "the public is served by the preservation of constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 694 (8th Cir. 2008) (finding public interest served by issuing injunction where plaintiff showed likelihood of success on the merits of First Amendment claim), *overruled in part on other grounds*, *Phelps-Roper v. City of Manchester*, 697 F.3d 67 (8th Cir. 2012); *D.M.*, 917 F.3d at 1003-04 (finding public interest served by issuing injunction where plaintiff showed likelihood of success on the merits of Equal Protection Clause claim). While the interests of landlords and tenants diverge pertaining to the Ordinance and its effects, the risk to constitutional rights in the absence of a preliminary injunction tilts the balance of harms and public interest factors in favor of Plaintiffs.

## Conclusion

Accordingly, after careful consideration and for the reasons explained above, the Court **ORDERS** that Plaintiffs' motion for preliminary injunction is **GRANTED**.

**IT IS FURTHER ORDERED** that the City, as well as the City's officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, shall be preliminarily enjoined and restrained from enforcing the Ordinance as it pertains to the Section 8 program. In particular, the City is enjoined from bringing or pursuing investigations pursuant to § 38-23 or imposing penalties pursuant to § 38-101 for any alleged violations of § 38-105 that are based on allegations of source-of-income discrimination related to the Section 8 program.

**IT IS FURTHER ORDERED** that this Order shall take effect immediately, and absent further order of this Court, shall remain in effect until the conclusion of litigation in this case.

**IT IS SO ORDERED.**

                                              s/ Roseann A. Ketchmark
                                              ROSEANN A. KETCHMARK, JUDGE
                                              UNITED STATES DISTRICT COURT

DATED: February 11, 2025